VILLAGE OF FALSE PASS; Village of Nelson Lagoon; Aleutians East Coastal Resource Service Area Board; Bering Sea Fishermen's Association; United Fishermen of Alaska; Jack U. Williams; Trustees for Alaska; Natural Resources Defense Council, Inc.; Friends of the Earth; National Audubon Society; Alaska Center for the Environment, Plaintiffs,

v.

James G. WATT, Secretary of the Interior; the United States Department of the Interior; John V. Byrne, Administrator of the National Oceanic and Atmospheric Administration; and the National Oceanic and Atmospheric Administration, Defendants,

Amoco Production Company, Arco Alaska, Inc., Exxon Corporation, Gulf Oil Corporation, Mobil Oil Corporation, Murphy Oil Corporation, Shell Oil Company, Texaco Inc., and Union Oil Company of California, Intervenors.

No. A 83–176 Civ.

United States District Court,
D. Alaska.

May 6, 1983.

Eric Smith, Trustees for Alaska, Anchorage, Alaska, Sarah Chasis, Natural Resources Defense Council, New York City, for plaintiffs.

Michael W. Reed/James M. Spears, Attys., Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Cynthia Christianson/Bruce M. Landon, Attys., Dept. of Justice Land & Natural Resources Div., United States Attorney's Office, Anchorage, Alaska, for defendants.

Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell, & Brundin, Anchorage, Alaska, E. Edward Bruce, John T. Smith & Bobby Burchfield, Covington & Burling, Washington, D.C., for intervenors.

OPINION

FITZGERALD, District Judge.

In July of 1982, Secretary of the Interior James Watt approved a final five year plan for opening vast areas of the outer continental shelf to oil and gas leasing, exploration and development. The present sale, Lease Sale No. 70, proposes to lease 479 tracts in the St. George Basin of Alaska's Bering Sea. Like almost every lease sale that the department has undertaken, this sale has been met with a formidable court challenge.[1]

The plaintiffs are the Villages of False Pass and Nelson Lagoon; the Bering Sea Fishermen's Association and the United Fishermen of Alaska; Jack U. Williams, a resident of Mekoryuk, Nunivak Island; the Aleutian East Coast Service Area Board, and several conservation and public interest organizations including the National Audubon Society, the Friends of the Earth, the Natural Resources Defense Council, the Trustees for Alaska, and the Alaska Center for the Environment. The defendants are the Department of the Interior and its secretary, James G. Watt, and the National Oceanic and Atmospheric Administration and its administrator, John V. Byrne. The plaintiffs ask for declaratory and injunctive relief nullifying the decision of the Secretary of the Interior to lease approximately 2.7 million acres of the St. George Basin for oil and gas exploration and development.

The St. George Basin holds some of the most important fish and wildlife resources in Alaska. Located in the southeastern Bering Sea between the eastern Aleutians and the Pribilof Islands, this basin is the gateway for virtually every marine mammal, fish, and bird species moving between the North Pacific and the Bering Sea; it also includes or adjoins wintering grounds for most of the species that move between the Arctic Ocean and the Bering Sea and

---

1. *See, e.g., County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2d Cir.1977) (Baltimore Canyon; Lease Sale No. 40); *Conservation Law Foundation v. Andrus,* 623 F.2d 712 (1st Cir.1979) (Georges Bank; Lease Sale No. 42); *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980) (Beaufort Sea; Lease Sale BF); *State of California v. Watt,* 683 F.2d 1253 (9th Cir.1982) (Santa Maria Basin; Lease Sale No. 53); *People of the Village of Gambell, et al. v. Watt,* N 83–003, (D. Alaska 1983) (Norton Sound; Lease Sale No. 57); *Conservation Law Foundation v. Watt,* 560 F.Supp. 561 (D.Mass. 1983).

North Pacific. The diversity and seasonal abundance of these animals in and adjacent to Unimak Pass and along the continental slope can be found in no other part of Alaska and perhaps the world. The ecological significance of this region to marine mammals (as well as other wildlife and fishes) is not yet fully understood, but in sheer numbers and multitude of species it is a region of primary importance. Of about 35 marine mammal species in the northern North Pacific and Bering Sea, 89 percent of the baleen whales, 57 percent of the toothed whales, and 73 percent of the seals and walruses regularly frequent the basin. The area contains important breeding and feeding habitats for many of these animals and is a transition zone during migration for others.

About 75 percent of the world population of northern fur seals breed and feed in the basin and the adjacent Pribilof Islands. For the eastern North Pacific gray whale, the basin and immediately adjacent waters are also vital during migration. Large numbers of Steller (northern) sea lions, harbor seals, spotted seals, ribbon seals, bearded seals, walruses, fin whales, and sea otters feed in and near the basin and, in several cases, mate, pup, and rear their young there as well.

About half of the St. George Basin lease area is comprised of shallow continental shelf waters from 200 to 400 meters deep; depths in the southern half range mainly from 200 to 3,500 meters. The proposed lease area is located on the outer continental shelf, within the basin proper, in waters 100–200 meters deep, about midway between the Pribilofs and Unimak Island. The importance of the lease area as a migratory corridor for many species of marine mammals, as well as fish and birds entered and leaving the Bering Sea, is well documented. The basin and Unimak Pass are also on the main shipping lane between the Bering Sea and North Pacific Ocean, and will be on the route taken for tankers carrying oil from more northern fields after production begins.

According to the environmental impact statement prepared by the Department of the Interior, the likelihood of success for the proposed lease sale is 28% that commercial oil and 37% that commercial gas resources will be discovered within the lease area. Hence, the probability is 72% that no commercial oil will be discovered and 63% that no commercial gas discovery will be made. In the event of discovery of commercial oil, it is estimated with a 95% statistical probability that 1.12 billion barrels of oil will be recovered from the area covered by the lease. St. George Basin Final Environmental Impact Statement (FEIS) at II–1–2.

Should the sale be completed the exploratory period is expected to begin in 1983 and end by 1987. Peak exploratory drilling activities should occur in 1985 with the employment of five drilling rigs and the completion of 15 wells. If hydrocarbons are located during the exploratory period, the development period could begin as early as 1985 with the placement of a production platform. The development period should end by 1991. During this period, as many as 250 production and service wells may be drilled from 11 production platforms. Pipeline construction should begin in 1987 and be completed in 1988. Total pipeline mileage in place would vary according to the location of the onshore processing facilities. Pipelines would likely be laid entirely under water except for the final few kilometers. However, if a facility is located at a port on the south side of the Alaska Peninsula, then approximately 48 kilometers of the pipeline would have to travel over land. Oil production is.expected to begin in 1989 and reach a peak output of 242 million barrels in 1991. Gas production could also begin in 1989. However, peak production of gas would not occur until 1993. Beyond 1991, industry activities could be expected to be confined to production operations. The volume of recovery is expected to decline with oil output ending in 2010 and gas reserves completely exhausted in 2019. FEIS, Table II. B.1.a–1.

The plaintiffs have mounted a broad base attack claiming the Secretary's decision is

inadequate on many grounds. According to plaintiffs:

1. The Secretary has arbitrarily and capriciously failed to fulfill his duty under the Outer Continental Shelf Lands Act to insure that offshore oil and gas activities are conducted in a balanced manner and without unreasonable risk to the biological resources of the St. George Basin.

2. Secretary Watt has violated the National Environmental Policy Act by preparing an inadequate environmental impact statement for Lease Sale 70.

3. The final environmental impact statement is inadequate because it fails to contain a worst case analysis of impacts on the resources of the Lease Sale 70 region.

4. The environmental impact statement is inadequate because it fails to adequately analyze adverse effects of Lease Sale 70.

5. The Secretary violated the Endangered Species Act by acting before he had received the biological opinion for the St. George Basin from the National Marine Fisheries Service.

6. The Secretary failed to insure that the gray and right whales will not be jeopardized by activities in the area of Lease Sale 70.[2]

Soon after the complaint was filed, plaintiffs moved for a preliminary injunction with supporting papers, including extensive memoranda and numerous exhibits. An expedited hearing on plaintiffs' application was scheduled for April 8, 1983. Shortly before the hearing, AMOCO Production Company, Exxon Corporation, Mobil Oil Corporation, ARCO Alaska, Inc., Gulf Oil Corporation, Murphy Oil Corporation, Shell Oil Company, Union Oil Company of California, and Texaco, Inc., applied for and were granted leave to intervene. The fed-

eral defendants and the intervenors filed papers on April 7, 1983, responding in detail to all claims advanced by plaintiffs. After the matter was fully argued on April 8, 1983, the parties agreed to file supplemental papers and to submit all issues for final decision. The plaintiffs agreed to withdraw their application for a preliminary injunction, following the government's agreement that no leases would be executed until after the close of business on May 12, 1983.

## A. THE OUTER CONTINENTAL SHELF LANDS ACT

In 1978, Congress, responding to increasingly serious domestic energy problems, passed the Outer Continental Shelf Lands Act Amendments of 1978. P.L. 95–372, 92 Stat. 630. The stated purpose of these amendments was to expedite the exploration and development of the outer continental shelf while retaining adequate assurances that the marine and coastal environments would be protected. 43 U.S.C. § 1802. In order to accomplish these goals, the act provides for an intricate combination of studies, reports, consultations, permits, plans, and licenses covering every aspect of the leasing and development process and involving federal, state, and local governments and regulatory bodies at every level. *See,* 43 U.S.C. §§ 1331–56.

The passage of this act has had substantial impact on traditional notions of environmental planning as they apply to the outer continental shelf. As a general rule evaluation of the environmental impacts of a federal action should take place early in the project's planning stages. The detail that is required, however, depends heavily upon the nature and scope of the proposed action. *State of California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). The federal

---

**2.** The original complaint also alleged 1) that the Secretary had violated the Coastal Zone Management Act by failing to insure that the final notice of sale for Lease Sale 70 was consistent to the maximum extent practicable with the Alaska Coastal Management Program; 2) that the National Marine Fisheries violated section 7(b) of the Endangered Species Act by arbitrarily and capriciously deleting the seasonal drill-

ing restrictions found in the Bering Sea Regional biological opinion when it issued the St. George Basin biological opinion; and 3) that the National Marine Fisheries Service violated section 7(b) of the Endangered Species Act by shifting responsibility for determining reasonable and prudent alternatives to the Department of the Interior. These claims were dropped by stipulation of the parties on April 18, 1983.

defendants and the intervenors contend that lease development on the outer continental shelf is, both by statute and by regulation, a phased process that proceeds in distinct stages. They conclude that the environmental investigations and decisions that accompany development of these resources must also proceed in stages. Since this assertion applies to most of the issues in this litigation, it becomes necessary at the outset to examine the statutory scheme.

The Outer Continental Shelf Lands Act divides the process of developing oil and gas leases on the outer continental shelf into three phases: leasing, exploration, and development and production. Oil and gas leasing is authorized by 43 U.S.C. § 1337 which allows the Secretary of the Interior to grant oil and gas leases on the submerged lands of the outer continental shelf to the highest bidder under a competitive bidding system.[3] These leases are for a base period of from 5 to 10 years, but continue in force for as long as oil and gas is produced in paying quantities. 43 U.S.C. § 1337(b)(2). The lease entitles the lessee to explore, develop, and produce oil and gas contained within the boundaries of his lease, conditioned upon due diligence and "the approval of the development and production plan required by this Act." 43 U.S.C. § 1337(b)(4).

Before any leases are issued, the Secretary must prepare an environmental impact statement for the lease sale and determine that the sale is consistent to the maximum extent practicable with the coastal zone management plan of any affected state which has an approved plan. *State of California v. Watt,* 683 F.2d 1253 (9th Cir.1982).

The exploration phase begins with the preparation of an exploration plan. Prior to approval of this plan, no lessee may undertake any exploration activity other than "preliminary activities." These are defined as "geological and geophysical and other surveys necessary to develop a comprehensive exploration plan." In no instance may preliminary activities "result in any physical penetration of the seabed of greater than 300 feet of unconsolidated formations, or 50 feet of consolidated formations" or "result in any significant adverse impact on the natural resources of the Outer Continental Shelf . . ." 30 C.F.R. 250.34–1(a)(1).

In addition, if any exploration activity would affect land or water use in the coastal zone of a state having an approved coastal zone management plan, the Secretary may not issue a license or permit for that activity unless the state agrees that the activity is consistent with its plan or the Secretary of Commerce finds that agreement is not necessary. 43 U.S.C. § 1340(c)(2).

The Outer Continental Shelf Lands Act provides authorization for the Secretary of the Interior to promulgate regulations imposing additional requirements on the approval of exploration plans. 43 U.S.C. §§ 1334(a), 1340(c)(1). In the exercise of this authority, the Secretary has promulgated regulations requiring that a lessee prepare an Environmental Report (Exploration) for submission with the exploration plan. 30 C.F.R. § 250.34–1(a)(2)(i). The environmental report must be in summary form and include all accurate, applicable and current information available at the time the related exploration plan is submitted. 30 C.F.R. § 250.34–3(a).

The lessee shall refer to information and data contained in the related plan, other Environmental Reports, and other environmental analyses and impact statements prepared for the geographic area by identifying the information and indicating a source for obtaining copies of the cited materials. Information and data which are site specific or which are developed subsequent to the most recent environmental impact statement or other environmental impact statements and

---

3. The bidding system for this sale is described in the final notice of sale. *See,* ad. rec., document 20 at 1–4.

analyses in the immediate area shall be specifically considered.

*Id.*

This environmental report must consider:

1. facilities for preventing, reporting, and cleaning up spills;

2. location, size, number and land requirements of onshore support and storage facilities;

3. estimated numbers of employees and families likely to locate in the affected area;

4. likely travel routes for boat and aircraft between onshore and offshore facilities;

5. quantity and composition of solid and liquid wastes and pollutants likely to be generated by offshore, onshore, and transport operations;

6. major supplies, services, energy, water, or other resources within affected states necessary to carry out the related plan; and

7. environmentally sensitive or potentially hazardous areas.

30 C.F.R. § 250.34–3(a)(1)(i). It must also contain:

an assessment of the direct effects on the offshore and onshore environments expected to occur as a result of the exploration plan, expressed in terms of magnitude and duration, with special emphasis upon identification and evaluation of unavoidable and irreversible impacts on the environment.

30 C.F.R. § 250.34–3(a)(1)(ii).

■ In short, the Secretary, before allowing any exploration to proceed, must conduct public hearings, give extensive consideration to the environmental consequences of exploration, and guarantee consistency with the coastal management program of any state that is affected by the outer continental shelf activity.

The Secretary is required to approve an exploration plan if he finds that it is consistent with the Outer Continental Shelf Lands Act, its regulations, and the terms of the lease. 43 U.S.C. § 1340(c)(1). He re-

tains, however, the authority to reject the plan and eventually cancel the lease, if he determines, after a hearing, that

(i) continued activity pursuant to such lease or permit would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment;

(ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and

(iii) the advantages of cancellation outweigh the advantages of continuing such lease or permit in force.

43 U.S.C. § 1334(a)(2)(A).

If commercial quantities of oil and gas are discovered by the lessee in the course of exploration, a development and production plan must be prepared. At the minimum, the plan must include:

(1) the specific work to be performed;

(2) a description of all facilities and operations located on the outer Continental Shelf which are proposed by the lessee or known by him (whether or not owned or operated by such lessee) to be directly related to the proposed development, including the location and size of such facilities and operations, and the land, labor, material, and energy requirements associated with such facilities and operations;

(3) the environmental safeguards to be implemented on the outer continental shelf and how such safeguards are to be implemented;

(4) all safety standards to be met and how such standards are to be met;

(5) an expected rate of development and production and a time schedule for performance; and

(6) such other relevant information as the Secretary may by regulation require.

43 U.S.C. § 1351(c). Here again, the Secretary may not grant any license or permit for any activity described in the plan that affects any land or water use in the coastal

zone of a state having an approved coastal zone management plan unless the state concurs or concurrence is excused. 43 U.S.C. § 1351(d).

A lessee seeking approval of a development and production plan must submit, in addition to the proposed plan, an environmental report containing information not otherwise contained in the related exploration plan. 30 C.F.R. § 250.34–3(b). This environmental report must contain a description of:

1. the location, description, and size of any offshore and land-based operations proposed for the activity;

2. the requirements for land, labor, material and energy for these operations;

3. a schedule of near-shore and onshore activities corresponding to the offshore development and production activities;

4. a description of environmental monitoring systems;

5. a description of contingency plans for the area and discussion of pollution prevention and clean up equipment to be maintained there; and

6. a narrative description of the existing environment.

30 C.F.R. § 250.34–3(b)(1).

While the Outer Continental Shelf Lands Act does not specifically require the preparation of an environmental impact statement at any particular phase of the development process, the National Environmental Policy Act requires that one be prepared for any major federal action significantly affecting the quality of the human environment.[4] 42 U.S.C. § 4332. In addition, regulations provide that at each stage of the development process the Secretary must determine whether or not an environmental impact statement must be prepared. 30 C.F.R. § 250.34–4. Similar procedures must be followed for significant amendments to any plan. *Id.* Moreover, the Secretary must, at least once, declare the approval of a development and production

plan in any area or region of the outer continental shelf to be a major federal action. 43 U.S.C. § 1351(e)(1). If approval of a development and production plan is found to be a major federal action, the Secretary is required to transmit a draft environmental impact statement to the governor of any affected state and make the draft available to any appropriate interstate regional entity and to the public. 43 U.S.C. § 1351(f).

■ Several conclusions can be drawn from this statutory scheme. First, Congress has decided to allow key decisions having serious environmental consequences to be made at the exploration and production and development stages instead of requiring all decisions to be made at the pre-leasing and leasing stages. Second, in order to protect environmental values, Congress has given the Secretary broad, continuing powers of supervision, including the power to modify, suspend, or even cancel the leases during the course of development when necessary to protect the environment. Third, the Secretary's failure to include specific protections for the environment at the leasing stage will not, of itself, be sufficient to stop the leasing process. Review of such a secretarial decision must always consider whether the decision to impose safeguards is one that would be made more appropriately at a later stage of development when more information will be available and the environmental dangers can be more clearly perceived.

These conclusions are supported by the legislative history of the Outer Continental Shelf Lands Act. The report of the Ad Hoc Select Committee on the Outer Continental Shelf states that:

> [The Act] provides a means to separate the Federal decision to allow private industry to explore for oil and gas from the Federal decision to allow development and production to proceed if the lessee finds oil and gas. The failure to have such a mechanism in the past has led to

4. The decision in *State of California v. Watt,* 683 F.2d 1253 (9th Cir.1982) states that "additional Environmental Impact Statements will

be required at the later exploration, production, and development stages." *Id.* at 1268.

extensive litigation prior to lease sales, when onshore and environmental impacts of production activity are not yet known. In fact, the failure to have this procedure has led, in part, at least one court to invalidate an entire lease sale.

H.R.Rep. No. 95–590, 95th Cong., 1st Sess., pg. 164, reprinted in [1978] U.S.Code Cong. & Ad.News 1450, 1570.

The legislative intent expressed in the statute and the legislative history has also been recognized and applied in a number of judicial decisions. *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980) considered an environmental challenge to the Beaufort Sea lease sale. In discussing the relevant legislation, the court observed that the Outer Continental Shelf Lands Act, the Endangered Species Act, and the Marine Mammal Protection Act each authorized the Secretary to review activities taking place under the leases on an ongoing basis and to suspend any activities which jeopardized the environment. The court concluded that the Outer Continental Shelf Lands Act contemplated future consideration by the Secretary of environmental problems developing after the lease sale.

> In fact, a purpose of OCSLA is to permit an expedient resolution of preliminary matters in the development of oil lands while preserving administrative and judicial review for future times when potential threats to the environment are readily visualized and evaluated. The 1978 amendments to OCSLA which authorize the Secretary to suspend activities on a lease if "continued activity . . . would . . . cause harm . . . [to marine life or environment]" must be taken seriously. The congressional intent to facilitate these lease sales, and to save until concrete a significant portion of substantive environmental determinations, compels this court to sanction the lease sale with confidence that environmental safeguards persist.

*Id.* at 595.

More recently, the Court of Appeals for the Ninth Circuit in *State of California v. Watt,* 683 F.2d 1253 (9th Cir.1982), con-sidered a challenge to Lease Sale 53 off the coast of California. The district court had allowed bids on the tracts in proposed Lease Sale 53 to be received and opened but had granted a preliminary injunction preventing the Department of the Interior from accepting or rejecting the bids or issuing leases on disputed tracts. The court of appeals acknowledged being influenced by the fact that additional environmental impact statements would be required in the later exploration, development and production stages and that these would, of course, be based on the latest estimates available at the time the statements were prepared. *Id.* at 1268. *See also, State of California v. Watt,* 668 F.2d 1290 (D.C.Cir.1980); *Conservation Law Foundation v. Andrus,* 623 F.2d 712 (1st Cir.1979).

Curiously enough, the best discussion of present state of the law can be found in a case decided before the Outer Continental Shelf Lands Act Amendments were enacted. In *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2d Cir.1977), a challenge had been made to Lease Sale 40 in the Baltimore Canyon Trough. The trial court had concluded that the environmental impact statement for Lease Sale 40 was inadequate because it failed to project possible pipeline routes and evaluate their feasibility in light of the myriad applicable state and local land use controls. 562 F.2d at 1374. In reversing this conclusion the court of appeals noted the real tension between the National Environmental Policy Act and the practicalities of offshore oil and gas exploration. On the one hand an environmental impact statement should "consider all significant environmental consequences that can reasonably be expected to flow from the decision to which the environmental impact statement relates." *Id.* at 1377. Because of this, an environmental impact statement cannot simply ignore known environmental consequences because they can be considered at a later time. *Id.* All environmental consequences should be considered to the extent "meaningfully possible." *Id.*

On the other hand, the court recognized that the Baltimore Canyon lease sale proceeded in three distinct stages. *Id.* Because of this, there might be circumstances in which postponing a decision until more data became available would be the wisest and fairest choice. *Id.* at 1378. The opinion concluded that in considering when a decision can be deferred, two factors must be kept in mind: 1) whether obtaining necessary information is "meaningfully possible" at the earlier time; and 2) the importance of having the additional information in making the initial decision to proceed. *Id.* The court concluded that:

... where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the "rule of reason." Indeed, in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand.

*Id.* at 1378.

*County of Suffolk* dealt only with the relation between the National Environmental Policy Act and offshore drilling programs. It did not consider other acts such as the Endangered Species Act or the Coastal Zone Management Act. Moreover, it did not consider the 1978 Amendments to the Outer Continental Shelf Lands Act since they were not yet effective. I conclude, however, that the general principles established by the case apply equally well to other acts protecting the environment, including the Coastal Zone Management Act and the Endangered Species Act. *See, State of California v. Watt,* 683 F.2d at 1265; *North Slope Borough,* 642 F.2d at 608–09.

██ The 1978 amendments impose a stratified structure on oil and gas exploration on the outer continental shelf much like that considered in *County of Suffolk.* They have, therefore, only strengthened that case's applicability. It follows that when any environmental statute is applied to oil and gas operations on the outer continental shelf, consideration must be given to the application of the Outer Continental Shelf Lands Act. In deciding whether the gathering of information or the implementation of protective measures can be deferred until a later stage in the development process, a number of factors must be taken into consideration. These factors include, but are not limited to,

1. the terms and purpose of the statute under consideration;

2. the importance to the decision that the information will have at the present stage;

3. the degree to which it is "meaningfully possible" to gather the necessary relevant information; and

4. the extent to which the Secretary retains power to monitor and control environmental consequences as activity progresses.

With these principles in mind, I now turn to the plaintiffs' claims under the Outer Continental Shelf Lands Act.

When conflicts arise between exploration of the oil and gas reserves of the outer continental shelf and other uses of the marine environment, the federal government has assumed primary responsibility for minimizing the conflict. 43 U.S.C. § 1801(13). The Outer Continental Shelf Lands Act undertakes to expedite resource development and to protect the coastal marine environment. 43 U.S.C. § 1802(2).

Plaintiffs claim that this imposes a duty on the Secretary to conduct offshore oil and gas activities in an evenhanded manner and to impose whatever safeguards are necessary to avoid an unreasonable risk to biological resources. Plaintiffs contend the Secretary failed to adopt the tract deletions and other mitigation measures that had been proposed by environmental groups, the State of Alaska and other interested parties, and failed to perform his duty fairly and impartially as required by the act.

Moreover, they claim he relied upon a flawed secretarial issue document in comparing the benefits and costs of the lease sale, and his decision must therefore be erroneous.

The Outer Continental Shelf Lands Act imposes a specific duty to balance development and environmental values in only two instances. First, under the act the Secretary is required to prepare a five year plan for leasing on the outer continental shelf. 43 U.S.C. § 1344(a). In preparing this program he is required to

> ... select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

43 U.S.C. § 1344(a)(3).

The federal defendants rightly point out, however, that I am without jurisdiction to consider claims under this section. Any action of the Secretary under 43 U.S.C. § 1344 is reviewable only in the United States Court of Appeals for the District of Columbia. 43 U.S.C. § 1349(c)(1).

A duty to proceed in a balanced manner is also imposed by Section 19 of the Outer Continental Shelf Lands Act 43 U.S.C. § 1345. This section provides a mechanism for coordination between the federal government and state and local governments affected by the sale. The governor of any affected state or the executive of any affected local government may, within sixty days after receiving notice of a proposed lease sale, submit recommendations to the Secretary of the Interior "regarding the size, timing, or location of any proposed lease sale." 43 U.S.C. § 1345(a). The Secretary is required to accept the governor's recommendations if he determines, after providing an opportunity for consultation, that "they provide for a reasonable balance between the national interest and the well-

being of the citizens of the affected State." 43 U.S.C. § 1345(c). The Secretary's decision must be communicated to the governor in writing and cannot be set aside unless it is arbitrary or capricious. 43 U.S.C. § 1345(c), (d).

On December 2, 1982, Secretary Watt sent a copy of the proposed notice of sale for Lease Sale 70 to then-Governor Jay Hammond and requested him to review the notice and submit the comments allowed by section 19. Ad. rec. at 9. Governor Sheffield responded in a letter to the Secretary on February 1, 1983. Plaintiffs' exhibit 6. He recommended that two stipulations be included in the final notice of sale, one covering oil spill response capability and the other the use of pipelines and loading facilities. He also recommended the addition of six information-to-lessees clauses covering special oil spill contingency plans for tracts near the Pribilofs and Unimak Pass, establishment of a biological task force, the need for drilling discharge permits, incorporation of local individuals and communities in environmental training programs, hiring of local residents, and cooperation with local organizations. The question of tract deletions was not addressed.

The Secretary responded to these recommendations by letter on March 31, 1983. Federal defendants' exhibit 1. After discussing each of the concerns raised in the governor's letter, the Secretary decided to include two stipulations, nos. 6 and 7, in the final notice of sale, to add additional information-to-lessee clauses and to amend some of those already proposed. While the Secretary did not adopt all of the state's recommendations, substantial accommodations were made. As a result, the State of Alaska has not become a party to this litigation.[5]

Plaintiffs find support for their claim that the Secretary has not struck a reasonable balance in the estimate that 4 to 7 oil spills can be expected during the course of

---

**5.** On April 4, 1983 Governor Sheffield and Secretary Watt entered into a memorandum of agreement concerning Lease Sale 70. Ad. rec. 28. Because of this memorandum, the state was able to agree that it had no further objections to the sale based on the Coastal Zone Management Act. Ad. rec. at 29.

outer continental shelf exploration, development and production in the St. George Basin. They claim that current oil spill containment and clean up techniques are insufficient to cope with substantial releases of oil in the Bering Sea environment and that a major oil spillage could jeopardize the continued existence of endangered gray and white whales, cause serious harm to other marine mammals and seabirds, and produce long term adverse impacts on the commercial fisheries and shell fisheries.[6]

■ In deciding whether the Secretary's decision not to adopt the proposed mitigating measures was arbitrary or capricious, I can consider only whether the decision "was based on a consideration of the relevant factors and whether there was a clear error of judgment." *State of California v. Watt,* 683 F.2d at 1268, *quoting Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The decision must be examined to discover whether the Secretary "articulated a rational connection between the facts found and the choice made," and made his decision in accordance with the law. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); 683 F.2d at 1269.

The concerns with oil spills and their consequences that the plaintiffs raise here have been contested throughout the planning process for Lease Sale 70. The administrative record reflects numerous references to these questions and they have been addressed by the Secretary on many occasions. *See e.g.,* FEIS at IV, *passim;* V–3, 7; K–

64, 95; Letter from Secretary Watt to Governor Sheffield, March 31, 1983, Federal defendants' exhibit 1. On this record there can be no question that the Secretary's decision considered all the relevant factors in this area. Additionally, the diffuse and generalized nature of plaintiffs' claims make it difficult to specify in what way the Secretary's judgment might be in error. Given that section 19 provides little or no guidance as to the proper balance to be struck by the Secretary between competing national and local interests, *see* 520 F.Supp. at 1384, the burden is on the plaintiffs to provide specific instances where the balance has been improperly struck. In effect, plaintiffs ask me to reevaluate the evidence and make my own decision as to what a proper balance should be. This I am unable to do. 683 F.2d at 1269.

Plaintiffs' claim of deficiencies in the secretarial issue document are also misdirected. This document was prepared by the Minerals Management Service of the Bureau of Land Management in November of 1982 to assist the Secretary in choosing among the lease sale alternatives. After briefly stating the concerns of various interested parties, including several of the plaintiffs, the document attempts to quantify the social costs and benefits of the proposed sale and its various alternatives.

The plaintiffs allege three deficiencies in this document:

1. the secretarial issue documents for Lease Sale 70 and for the five year leasing program are inconsistent. The former gives an estimate of 1.2 billion barrels of oil for the lease sale area and the latter give an estimate of only .7 billion

---

6. I have strong doubts about the plaintiffs' ability to pursue a challenge under section 19 of the Outer Continental Shelf Lands Act when the state itself is not challenging the Secretary's decision. Section 19 deals with the tension between the national interest in development and the well-being of the citizens of particular states affected by the sale. *See,* 43 U.S.C. § 1345(c). The coordination and consultation mechanisms required by section 19 all take place between the Secretary of the Interior, as representative of the federal government, and elected representatives of the people of the affected state.

The section makes no mention of input from other groups. I feel that it would be anomalous to allow private parties to call the reasonableness of a section 19 accommodation into question when the state and federal government have agreed on precisely the type of coordination that section 19 was intended to provide. Since this issue has not been raised by the parties or adequately briefed, however, I do not decide it here and will assume that plaintiffs' claims are properly raised.

barrels of oil for the whole St. George Basin, a region which includes two other lease sale areas;[7]

2. the secretarial issue document improperly uses a conditional resource estimate instead of an unconditional resource estimate;

3. the secretarial issue document relies on inaccurate assumptions contained in the environmental impact statement.

■ None of these claims was raised by the governor of Alaska. Since section 1345 deals only with the Secretary's acceptance or rejection of the governor's recommendations, it would be inappropriate to consider these claims. Were it appropriate, however, to consider these claims, I conclude that each is without merit.

The 1.12 billion barrel estimate for oil reserves is taken from the final environmental impact statement, which explains the method by which it is derived. FEIS at II-1. As the environmental impact statement admits, the estimates are subject to a great many variables and thus have a large margin for error. *Id.* In fact, the final environmental impact statement notes that the resource estimates vary from .24 billion barrels to 3.04 billion barrels and that 1.12 billion barrels is the mean estimate. *Id.*

Plaintiffs have provided no evidence that the data on which the projection is based is false or that the methodology used to arrive at this mean estimate is incorrect. Given the broad margin for error contained in the final environmental impact statement, I do not find the above discrepancy in estimates unacceptable. *See, State of California v. Watt,* 683 F.2d at 1268 (oil resource estimates inherently speculative).

With respect to plaintiffs' claim that the analysis of economic benefits should be based on unconditional resource estimates and not on conditional resource estimates, I

have previously noted that my review is limited to ensuring that the Secretary has considered all the relevant factors and made no clear error of judgment. 683 F.2d at 1268. The secretarial issue document clearly indicates that the estimates used are conditional and the Secretary has not been misled.

In effect, plaintiffs claim that if unconditional estimates were used, the Secretary would be required to cancel the sale since the economic benefits would no longer outweigh the costs. The statute, however, does not require the Secretary to effect a strict quantitative comparison of the costs and benefits. Instead he is required to balance "the national interest and the well-being of the citizens of the affected State." 43 U.S.C. § 1345(c). As the Court of Appeals for the District of Columbia has observed in connection with its discussion of section 18(a)(3) of the Outer Continental Shelf Lands Act:

> A balancing of factors is not the same as treating all factors equally. The obligation instead is to look at all factors and then balance the results. The Act does not mandate any particular balance, but vests the Secretary with discretion to weigh the elements so as to "best meet national energy needs."

*State of California by and through Brown v. Watt,* 668 F.2d 1290, 1317 (D.C.Cir.1981). This claim is therefore without merit.

Finally, plaintiffs' claim that the secretarial issue document relies on inaccurate assumptions contained in the final environmental impact statement is also without merit since, as will be shown, no such inaccurate assumptions are made in the final environmental impact statement.

## B. THE NATIONAL ENVIRONMENTAL POLICY ACT

In making decisions about leasing on the outer continental shelf, the Secretary con-

---

7. The Bering Sea region encompasses four areas:
 1. the Norton Basin (Lease Sales 57, 88, 99);
 2. the St. George Basin (Lease Sales 70, 89, 101);
 3. the Northern Aleutian Shelf (Lease Sales 75, 92); and

 4. the Navarin Basin (Lease Sales 83, 107). The timing of these sales is described in the final environmental impact statement. FEIS, Fig. I.A.1,–1.

siders an extensive administrative record. Preparation for the St. George Lease Sale, for example, began on July 26, 1979 when the Department of the Interior issued a call for nominations and comments on proposed Lease Sale 70. 44 Fed.Reg. 43, 818. The call sought comments from interested federal agencies, the State of Alaska, and the general public on the desirability of holding the sale and the tracts that ought to be offered for lease. The Department's tentative tract selections were announced in February of 1980. *See,* FEIS at I–3.

As part of the preparation of a draft environmental impact statement for the sale, a meeting of scientists working on outer continental shelf problems was held in April of 1980 under the auspices of the National Oceanic and Atmospheric Administration and the Bureau of Land Management. This so-called synthesis meeting, part of an ongoing program of meetings under the Outer Continental Shelf Environmental Assessment Program, attempted to evaluate the then available environmental information as it bore on the proposed lease sale. A synthesis report, "The St. George Basin Environmental and Possible Consequences of Planned Offshore Oil and Gas Development", containing the results of this meeting, was published in March of 1981.

In October of 1981 the Bureau of Land Management issued a draft environmental impact statement for Lease Sale 70. Public hearings on this document were held in Cold Bay, Unalaska, St. Paul, and Anchorage and a large number of comments were received, including extensive comments by most of the plaintiffs in this suit.[8] FEIS, appendix K. Based on this information a final environmental impact statement was prepared and issued by the Bureau in August of 1982.

Both the Coastal Zone Management Act, 16 U.S.C. §§ 1451–64, and the Endangered Species Act, 16 U.S.C. §§ 1531–1543, require the preparation of reports dealing with the environmental consequences of offshore leasing. Under the Coastal Zone Management Act, any federal agency "conducting or supporting activities directly affecting the coastal zone" of a state having an approved coastal zone management plan, must submit to the governor of the affected state a document known as a consistency determination. The consistency determination must include a detailed description of the activity and its associated facilities, an analysis of the projected effects on the state's coastal zone, and comprehensive data sufficient to support a finding that the activity is consistent with the state plan "to the maximum extent practicable." 16 U.S.C. § 1456(c)(1); 15 C.F.R. § 930.39. A consistency determination for Lease Sale 70 was prepared and submitted to the State of Alaska on December 3, 1982.[9]

The Endangered Species Act requires each federal agency to ensure that its activities are not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2). Whenever an agency proposes to undertake any action which "may affect" any endangered species, it must undertake formal consultation with the Secretary of Commerce for the purpose of determining the effect of the proposed action on the endangered species.[10] After this consultation is finished, the Secretary of Commerce is required to provide the agency with a biological opinion detailing how the agency action affects both the species and its habitat and suggesting reasonable and prudent alternatives for avoiding the adverse impact. 16 U.S.C. § 1536(b).

---

**8.** A large number of other western Alaska communities were included in the public hearings by teleconference. These included False Pass, Sand Point, King Cove, Nelson Lagoon, Niloski, Atka, and Akutan. FEIS at I–4.

**9.** See, note 5, *supra.*

**10.** Depending on which species is involved, consultation will be with the Secretary of Commerce, the Secretary of the Interior, or the Secretary of Agriculture. See 16 U.S.C. § 1532(15); 50 C.F.R. §§ 402.01, 222.23(a), 227.4. For the purposes of the present discussion, all consultation is with the Secretary of Commerce.

On June 6, 1980 the Bureau of Land Management requested formal consultation with the National Marine Fisheries Service about the effect on endangered whales of lease sale activities in the whole Bering Sea Region.[11] The resulting regional opinion was eventually included as an appendix to the final environmental impact statement. FEIS, appendix D. Formal consultation directed specifically at Lease Sale 70 was initiated on June 16, 1982. The biological opinion for this consultation, referred to by the parties as the St. George opinion, was issued by the National Marine Fisheries Service on March 9, 1983.

 Since the crux of most challenges under the National Environmental Policy Act is the adequacy of the environmental impact statement, identification of the record on which that adequacy is to be judged can be crucial. The adequacy of the environmental impact statement itself is to be judged solely by the information contained in that document. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir.1980). Documents not incorporated in the environmental impact statement by reference or contained in a supplemental environmental impact statement cannot be used to bolster an inadequate discussion in the environmental impact statement. *Id.*

 At the same time, the administrative record plays an important part in judicial review of the adequacy of an environmental impact statement. An environmental impact statement is not required to discuss every conceivable consequence of an agency's actions. Under the rule of reason, the environmental impact statement is not required to consider alternatives or consequences that are only speculative or are too remote. 626 F.2d at 1074. In making a decision whether a particular alternative should have been discussed in the environmental impact statement or should have been discussed more extensively, a court may, however, rely on evidence in the ad-

ministrative record outside of the environmental impact statement. *Id.* It may also take evidence, including expert testimony, on technical matters. 562 F.2d at 1384. Neither the administrative record outside of the environmental impact statement nor any additional evidence may be used to remedy any deficiency in the environmental impact statement. 626 F.2d at 1024. *See also, State of California v. Block,* 690 F.2d at 765.

In the present case, the final environmental impact statement incorporates by reference the Bering Sea regional biological opinion. FEIS, appendix D. I have therefore given careful consideration to the information contained in it in deciding whether or not the final environmental impact statement is adequate. The St. George Basin biological opinion on the other hand, was not prepared until after the issuance of the final environmental impact statement and has not received the treatment necessary for a supplemental environmental impact statement. Plaintiffs' exhibit 2; 40 C.F.R. § 1502.9(c)(4). I do not consider the information in this document, therefore, to add to that already contained in the environmental impact statement. As can be seen from the discussion below, however, I do consider it in determining whether the scope of the discussion in the environmental impact statement is adequate.

Plaintiffs' claims under the National Environmental Policy Act fall into two general categories. The first category deals with oil spills and the consequences of petroleum in the environment. Plaintiffs contend that the environmental impact statement has not adequately analyzed several crucial problems in this area including:

1. the impacts of different sized oil spills;

2. toxicity of oil after 3–10 days;

3. persistence of oil in the Arctic marine environment;

4. oil spill impacts on the food chain;

---

11. The duties of the Secretary of Commerce with respect to the Endangered Species Act have been delegated to the Administrator of the National Oceanic and Atmospheric Administra-
tion. The administrator has in turn delegated his authority to the National Marine Fisheries Service.

5. impacts of transportation
 a. by pipeline to the Alaska Peninsula,
 b. south of the Alaska Peninsula via tanker,
 c. subsurface transportation of oil; and
6. the impacts of subsurface blowouts.

The second category relates to plaintiffs' contentions that the environmental impact statement is inadequate because it fails to contain certain worst case analyses.

The federal defendants and the intervenors in response assert that all of these topics have been adequately considered. They also suggest that the parameters of an environmental impact statement prepared prior to a leasing decision must be determined in part by the environmental consequences implicated by the decisions to be made. Since the Secretary's decision here is only to lease the tracts and not to authorize exploration or production activities, the scope of the environmental impact statement would be limited to those activities which could be conducted without further review or authorization by the Secretary. The federal defendants and intervenors further suggest that a lessee obtaining a federal oil and gas lease on the outer continental shelf is authorized by the lease to conduct only preliminary surveys leading to preparation of an exploration plan. Only if commercial quantities of oil or gas are discovered will it become necessary to consider the environmental consequences arising out of development and production of oil and gas in the leased area.

The statutory framework, as understood by the federal defendants and intervenors, progresses in legislatively defined stages from leasing through exploration, and finally to development and production. After leasing, the Secretary is required at each step to undertake a comprehensive review of the lessee's proposed plans detailing future activities and to take into consideration all relevant information concerning the environment then available. Unless the Secretary grants approval of the leaseholder's proposed plans, future activity relating to exploration or to development and pro-

duction cannot be implemented. According to the federal defendants and intervenors, the plaintiffs misconceived or misunderstood the statutory scheme. They assert that plaintiffs' claims relating to oil spills and the consequences of petroleum in the environment should properly be addressed after commercial quantities of oil or gas have been discovered. As is usual in these cases, the correct approach lies somewhere between these two extremes.

The appropriate standard for judicial review of the adequacy of the environmental impact statement is established by the Administrative Procedures Act. The act provides in relevant part that:

> . . . The reviewing court shall—
>
> * * * * * *
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> * * * * * *
>
> (D) without observation of procedure required by law.

5 U.S.C. § 706.

The proper application of this standard has been clearly articulated for this circuit by Judge Duniway in *Lathan v. Brinegar:*

> Subsection (2)(A) refers primarily to substantive decisions committed to the Agency in the first instance. It may be applicable (we do not say that it is) where it is claimed that the Agency, in deciding whether to proceed with a project, has ignored conclusions or considerations stated in an EIS. Such a question is for the Agency, not the courts, to decide. The scope of judicial review in such a case is narrow, if review be available at all. We could reverse the Agency, if at all, only in a rare case, and only if we found its action arbitrary, capricious, an abuse of discretion, or contrary to law. We could not substitute our judgment for that of the Agency.
>
> On the other hand, subsection (2)(D) provides that we may set aside agency

action if we find it to be without observance of procedure required by law. We regard the question whether an EIS complies with the requirements of NEPA as a procedural question, governed by § 706(2)(D). In *Life of the Land v. Brinegar,* 9 Cir., 1973, 485 F.2d 460, 469, we quoted *Jicarilla Apache Tribe,* regarding substantive decisions, but then apparently applied § 706(2)(A) to the question whether the EIS satisfied the requirements of NEPA. This appears to be a misreading of *Jicarilla Apache Tribe,* but our reading of *Life of the Land* convinces us that the result would be no different if we had thought that § 706(2)(D) applied.

We stand on § 706(2)(D) because NEPA is essentially a procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The procedures required by NEPA, 42 U.S.C. § 4332(2)(C), are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging, *pro forma* compliance will not do. We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA than if they confine themselves within the straight jacket of § 706(2)(A).

506 F.2d 677, 692 (9th Cir.1974) (en banc) (citations deleted).

■ A clear distinction must therefore be drawn between challenges to the Secretary's decision to proceed with a particular development alternative and challenges to the adequacy of an environmental impact statement. The former is a substantive question governed by the arbitrary and capricious standard of section 706(2)(A), while the latter is procedural and governed by section 706(2)(D).

1. Adequacy of the Environmental Impact Statement:

As noted above, plaintiffs' objections to the environmental impact statement fall into two categories: first, that it failed to analyze certain biological impacts adequately and second, that it failed to include necessary worst case analyses.

Plaintiffs contend that the environmental impact statement significantly underestimates biological impacts because it fails to consider adequately:

1. persistence of hydrocarbons in the marine environment;

2. the potential toxicity of spilled oil for long periods;

3. adverse impacts of oil on the food chain;

4. the impacts of a very large spill in the range of 100,000 to 500,000 barrels.

■ The environmental impact statement is not required to consider every conceivable biological consequence of a project. Instead the adequacy of an environmental impact statement is judged under a "rule of reason."

[O]ne of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry." "The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible * * * " But implicit in this rule of reason is the overriding statutory duty of compliance with impact statement procedures to the "fullest extent possible."

*Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1092 (D.C.Cir.1973). Under the rule

of reason, an environmental impact statement will be considered adequate if it

has been complied in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

562 F.2d at 1375.

■ Moreover, the unavailability of information should not be permitted to halt all government action. *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir.1973). This is particularly true when information may become available at a later time and can still be used to influence the agency's decision. *Sierra Club v. Morton,* 510 F.2d 813 (5th Cir.1975).

Although the rule of reason determines the adequacy of an environmental impact statement, administrative regulations are also guides for determining its sufficiency. The Council on Environmental Quality has promulgated regulations for the preparation of environmental impact statements that are binding upon all federal agencies. 40 C.F.R. §§ 1500–08; *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). These regulations define the primary purpose of an environmental impact statement.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. . . .

40 C.F.R. § 1502.1.

The regulations also recognize and provide for the practice of tiering environmental impact statements. 40 C.F.R. § 1508.28 provides in relevant part:

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

This regulation implies, or at least suggests, that tiering serves to focus on issues ripe for decision and to exclude from consideration issues not ripe. Were the regulation to be strictly followed, the environmental impact statement prepared for Lease Sale 70 might not have needed to discuss environmental impacts relating to development and production until after a discovery had been made. This would have been, however, a dangerous course to follow. As the Second Circuit has noted in a case similar to this one, inclusion of material in an environmental impact statement cannot be deferred simply because it can be included in a later environmental impact statement:

. . . It is recognized that the EIS must consider all significant environmental consequences that can reasonably be expected to flow from the decision to which the EIS relates. An EIS cannot safely

ignore clear environmental consequences of the decision at hand on the ground that another statement will be forthcoming later. Since the lease contract presented for the Secretary's consideration would grant to each lessee of a tract the right for five years to search for oil and gas in economic quantities and upon such discovery to produce and transport the oil and gas to shore as long as it could be produced in paying quantities, it was essential to consider and weigh the environmental aspects of transportation, as well as of exploration and production, to the extent "meaningfully possible," before deciding whether to authorize the leasing program.

*County of Suffolk v. Secretary of Interior,* 562 F.2d at 1377 (2d Cir.1977) (citations deleted).

I do not find it necessary to decide now whether the tiering regulations would allow the Secretary to limit the environmental impact statement to consideration of preliminary activities and their consequences only, since the statement that was prepared for this lease sale considered the environmental consequences of exploration, development and production as well. *See, generally,* FEIS, Section IV. I note, however, that consideration at the leasing stage of potential or anticipated environmental consequences relating to exploration, development and production activities serves a number of important objectives. The inclusion into a leasing stage environmental impact statement of known environmental information relating to later exploration or development activities which may in some way bear significant relationship to the leasing decision or to the preliminary activities serves to alert the Secretary to any environmental consequences which may be irreversible. Information relating to potential or anticipated environmental consequences may also focus on the need to develop further information necessary for adequate discussion and consideration in an exploration or development and production environmental impact statement. Finally, the legislative scheme providing for several administrative decisions along the progres-

sion from leasing through production should not unnecessarily weaken the legislative objectives underlying the National Environmental Policy Act, the Endangered Species Act, the Marine Mammal Protection Act, or other acts serving to protect the environment. On the other hand, although known environmental consequences relating to a later stage ought to be included in a leasing stage environmental impact statement, it is not necessary to include information about environmental consequences which are conjectural or speculative, and will remain so until exploration or development. With this in mind, I conclude that with one exception plaintiffs' objections to the adequacy of the environmental impact statement prepared for Lease Sale 70 may not be sustained.

The environmental impact statement for Lease Sale 70 includes a comprehensive analysis of oil spills. The analysis begins with several assumptions which have not been challenged here. It is assumed for instance that oil spill estimates in the St. George region can be based on past outer continental shelf experience, that the spill rate is dependent upon the volume of oil produced or transported, and that oil spills occur independently of one another. FEIS at IV–6.

The environmental impact statement computes three separate probabilities based on these assumptions. The first of these is the likelihood that commercial quantities of oil will be discovered. Based on the presently available data, this is estimated to be approximately 28% with a mean estimate of 1.12 billion barrels of oil. The second probability is conditional. It is the likelihood that an oil spill will occur given that commercial quantities of oil are discovered. In order to make this estimate, spills of two different size were considered: 1,000 barrels and greater and 10,000 barrels and greater, spills of the former size being considered serious and those of the latter size catastrophic. FEIS at IV–6. Since there has been almost no production from the Alaska outer continental shelf, data on spills from platforms and pipelines was tak-

en from United States Geological Survey accident and production files for the Gulf of Mexico and California. Spill rates for tankers were interpolated from what was available in the literature. From this data, the probable number of spills of each size per billion barrels produced and transported was calculated. Spill rates for production in Cook Inlet were considered, but the data base for this production was too small to conclude with a high degree of certainty that the spill rate for Alaska would differ from that in the rest of the outer continental shelf. FEIS at IV–7.

The third probability calculated assumed both that commercial quantities of oil were discovered and that spills would occur. Given these two assumptions, the document analyzed the probability that the spills would reach areas on the Alaska coast or periphery of the St. George Basin study area within 3, 10, or 30 days. For this purpose 30 launch points, representing possible hypothetical spills, were selected, and the boundary of the study area was divided in 57 impact regions. FEIS, Fig. IV, A.4.b–1, IV, A.4.c–1. An additional 41 offshore areas within the study area were selected for analysis of impacts on seabirds and marine mammals and eight areas for bottom fish and fish egg analysis. FEIS, E–2, 3. Separate analyses were then done for the proposed sale, three of the sale alternatives, and a combined scenario in which the impact of projected tankering from the Norton Sound sale area was also considered. Separate consideration for each of these alternatives was given for each of four possible transportation scenarios. Finally, all of the above probabilities were combined to give the probability of one or more spills occurring and impacting upon a particular area over the expected production life of the field. FEIS, Appendix E.

These statistics were used to calculate the expected impact on various types of organisms in the sale study area. Studies giving the distribution of a particular fish, bird, crustacean, or mammal within the study area and the effect of oil on it were combined with the probability that oil would contact that area to give information about the expected consequences of oil spills resulting from the sale.

Some of these consequences are severe. The statement estimates, for example, that the probability of oil movement into the area offshore from Izembek Lagoon is 41 percent, FEIS at IV–39. Although the probability of oil entering the lagoon itself is exceedingly small, given that millions of shearwaters, pertrels, and other water birds frequent the area, large scale short-term reductions in the numbers of these animals are considered likely, FEIS at IV–40. Similar large, though short-term, declines are considered likely for sea otters, fur seals, and other marine mammals, FEIS at IV–46.

Plaintiffs' first objection to this analysis is that it fails to consider the differences in extent and severity resulting from different size spills. As noted above, the environmental impact statement considered two sizes of oil spills, those in excess of 1,000 barrels and those in excess of 10,000 barrels. Plaintiffs claim that it should also have considered spills in excess of 100,000 barrels. They cite two spills of this size, the wreck of the tanker AMOCO CADIZ off the coast of Britain in 1978 (1.6 million barrels) and the blowout of the exploratory well Ixtoc I off the coast of Mexico in 1979. (3.5 million barrels). They also submit the affidavit of Robert Howarth, a specialist in the environmental consequences of pollutants in marine ecosystems. Plaintiffs' exhibit 11. Dr. Howarth contends that since a 100,000 barrel spill can be expected to cover a much larger area than a 10,000 barrel spill, the amount of resources affected by the larger spill would be correspondingly greater.

This claim is sketchily made in the complaint and brief and the precise objection being made is not clear. Since the complaint speaks in terms of both extent and severity, plaintiffs might be objecting to either the analysis of which areas are likely to experience oil spill impacts or to the analysis of the effects an oil spill would have on the animals of that area. I will assume that both are intended.

■ The rule of reason applicable to environmental impact statements does not require an inquiry into every conceivable situation that may occur no matter how remote or speculative it may be. All that is required is a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). It follows that a party cannot simply allege that the Secretary ought to have employed a different classification scheme. At a minimum, he must show that a sufficient data base exists from which statistically reliable conclusions can be drawn and that the information derived from this data would have a statistically significant effect on the classification scheme used by the Secretary.[12]

■ It is important to remember that the oil spill analysis divided into two distinct components: an oil spill risk analysis covering the probability, extent, and place of impact of anticipated oil spills, FEIS at IV–5–13, and a biological impact analysis of the damage that a hypothetical spill would cause in the various impact areas. FEIS at IV–23–56. With regard to the first of these two analyses, plaintiffs' expert states, without supporting evidence, that large spill sizes have greater effects. I find this assertion insufficient. In deciding to classify all large spills into a category of 10,000 barrels and larger, the Secretary implies that no statistically significant difference in the oil spill risk analysis would result from separate consideration of 100,000 barrels and greater spills. Although the AMOCO CADIZ and Ixtoc I disasters show that spills of this size are certainly possible, plaintiffs have not presented any evidence that a sufficient data base exists for separately evaluating these risks or that an analysis, if done, would yield a significantly different result in the statistical probabilities found in the FEIS. *See, Sierra Club v. Sigler,* 695 F.2d 957, 975 n. 14 (5th Cir.1983).

Nor does plaintiffs' expert seriously challenge the validity of the oil spill size classification as it applies to the biological impact analysis. No evidence is provided to show that a statistically significant difference in the impacts discussed in the final environmental impact statement would occur from considering spills in the 100,000 barrel range separately. I therefore conclude that plaintiffs have failed to show that the Secretary was required to undertake a more detailed analysis of the effect of spill size on the biological consequences of an oil spill.

■ Plaintiffs next claim that the environmental impact statement does not adequately consider biological impacts because it erroneously assumes that spilled oil is no longer toxic after 3–10 days of weathering. The final environmental impact statement makes no such assumption, however. In computing the probable trajectories and impact regions of oil spills, three time periods were selected for consideration:

1. a three day period in which the toxicity of the spill was considered to be greatest;
2. a ten day period after which clean up equipment could be assumed to have been deployed; and
3. a 30 day period after which the difficulty of tracking spills exceeded the limitations of the model.

FEIS II–10. The tables summarizing the oil spill trajectory and impact analysis give complete information about all periods including the 30 day probabilities. FEIS, tables E–3, E–6, E–9.

A 10-day limitation is adopted in the final environmental impact statement only for the purpose of comparing the effect on biological resources of the different sale alternatives and transportation scenarios. FEIS at IV–39, 45. Comparison for this purpose was not attempted at the 30-day impact level. *See,* FEIS at V–25. Plaintiffs' affidavits show only that there is evidence of oil's continuing toxicity after 30 days, a fact which is acknowledged in the environmental impact statement itself. (Plaintiffs' exhibits 11, 12): FEIS at IV–27. No evidence has been provided that factor-

12. *See, Sierra Club v. Sigler,* 695 F.2d 957, 975 n. 14 (5th Cir.1983).

ing data on toxicity after 30 days and the probabilities for 30 day impacts into the comparison would affect the comparison with any degree of statistical significance.

■ Plaintiffs suggest that the environmental impact statement underestimates biological impacts because it fails to discuss the persistence of oil in the marine environment and the consequences of long-term chronic exposure of marine organism to oil from spills or offshore blowouts. Accordingly, plaintiffs maintain that the discussion relating to oil persistence incorrectly assumes that impacts will be immediate and of short duration.

The environmental impact statement, however, does discuss the persistence of oil in marine environments. In fact the question of persistence and its environmental consequences are discussed quite extensively. FEIS at IV–24–55. Plaintiffs' objection seems to be that this discussion considered the chronic long-term results of moderate spillages only and did not consider those resulting from catastrophic spills or extraordinary large blowouts.

I conclude that it was not necessary to discuss in this environmental impact statement either the environmental consequences or the persistence of oil in the marine environment after a catastrophic spill. I have previously concluded that plaintiffs have failed to demonstrate the unreliability of the statistical method adopted in the environmental impact statement for oil spill analysis. So far as I know, and plaintiffs have failed to show otherwise, I know of no statistical data upon which to base the probability of catastrophic spills, such as those identified by plaintiffs. Moreover at an earlier point, I concluded that the leasing stage environmental impact statement need not include speculative or uncertain information concerning potential or anticipated environmental consequences affecting only exploration or production stages of an oil lease. The catastrophic spill envisioned by the plaintiffs is such an event.

■ Plaintiffs also contend the environmental impact statement is inadequate because it fails to discuss the impacts of petroleum development on bottom dwelling organisms and the resultant adverse impacts on the complex food webs upon which fish, shellfish, marine mammals and birds depend. There is, however, extensive and adequate discussion about the impacts of petroleum in the food chain and upon shellfish, birds and marine mammals. FEIS at IV–24–55. The final environmental impact statement noted, for example, that effects on zooplankton may be transitory and that certain amphipods may be affected by oil pollution. FEIS at IV 53–54. In a response to a comment by the Tanadgusix Corporation, it notes that marine phytoplankton are relatively tolerant of hydrocarbons and that even a large oil spill "would not significantly affect productivity at the primary level." FEIS at V–43. The problem of bottom-dwelling organisms and contamination of sediments is also discussed. FEIS at V–47. To the extent that the environmental impact statement does not discuss presently unknown environmental consequences arising from development or production, I conclude that this analysis may be made at a later date when more accurate or reliable information is available.

■ For the same reasons I reject plaintiffs' contentions that the environmental impact statement is inadequate by reason of its failure to analyze the transportation of oil by pipeline to the Alaska Peninsula and south via tanker. I conclude that transportation of oil, as such, is adequately discussed in the environmental impact statement and potential and anticipated environmental consequences have been adequately addressed based upon the known environmental consequences at this time.

■ Finally, plaintiffs claim that the final environmental impact statement contains an inadequate discussion of subsurface blowouts and subsurface oil transports. Although the probabilities for subsurface blowouts and pipeline breaks are not separately considered, they are contained in the estimates for platform and pipeline spillage.

FEIS at IV–6. The question of non-surface oil transport was raised by the Friends of the Earth during the comment stage. The Secretary's response was that information on subsurface transport was not presently available but that studies of this problem were being made. FEIS at V–25. Plaintiffs have not shown that this information is presently available or that any potential problem resulting from the lack of information cannot be adequately remedied after the present studies are completed. I therefore conclude that the problem need not be further addressed at this time.

2. Failure to Prepare a Worst Case Analysis:

Plaintiffs' second contention is that the environmental impact statement is inadequate since it did not include a worst case analysis of environmental consequences of oil spills. I have already concluded that most of the impacts and environmental consequences, which plaintiffs claim are inadequately discussed in the environmental impact statement, including those on seals, birds, fish, and shellfish, have in fact been adequately discussed. Accordingly, as to those potential or anticipated environmental consequences, a worst case analysis is not required at this time. Plaintiffs' arguments about the need for a worst case analysis of impacts on whales, however, require careful consideration.

 The National Environmental Policy Act itself provides only the broadest sort of guidelines for implementing the policies which it sets forth. The act has in fact been characterized as "no more than a catalyst for development of a 'common law' of NEPA." *Kleppe v. Sierra Club,* 427 U.S. 390, 421, 96 S.Ct. 2718, 2735, 49 L.Ed.2d 576 (1976) (Marshall, J., concurring in part and dissenting in part); *Sierra Club v. Sigler,* 695 F.2d 957, 965 (5th Cir.1983). The Council on Environmental Quality regulations, however, make the act's application much more definite. 40 C.F.R. §§ 1500–08. As noted above, these regulations are entitled to substantial deference from the courts in interpreting the act and are binding on all federal agencies. *Andrus v. Sierra Club,* 442 U.S. 347, 356–58, 99 S.Ct. 2335, 2340–41, 60 L.Ed.2d 943 (1979).

 Situations often arise when information that would be considered important for the preparation of an environmental impact statement is unavailable. If the National Environmental Policy Act barred agency action until this information became available, it is unlikely that any project requiring an environmental impact statement would ever be completed. *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 & n. 11 (9th Cir.1973). Courts have therefore adopted the rule that agencies are required to weigh the cost of proceeding in the absence of sufficient information as one factor in their decisions. *State of Alaska v. Andrus,* 580 F.2d 465, 473 (D.C.Cir.1977).

This judicially adopted principle has been incorporated into the Council on Environmental Quality regulations. 40 C.F.R. § 1502.22 requires an agency to determine those situations where relevant information is missing or scientific uncertainty exists. Information relevant to adverse impacts must be included in the environmental impact statement whenever it is essential to a reasoned choice among alternatives and the cost of obtaining it is not exorbitant. 40 C.F.R. § 1502.22(a). If the information is essential, but the cost is exorbitant, the agency is required to prepare a worst case analysis and indicate the probability or improbability of its occurrence. *Id.* at § 1502.22(b)(1). A worst case analysis must also be prepared if the information, though not essential to a reasoned choice, is important and the means for obtaining it are not known. *Id.* at § 1502.22(b)(2). Whenever a worst case analysis is prepared, the agency must "weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty." *Id.*

The available information suggests that the Bering Sea region is frequented by at least eight species of whales. These include the right whale, bowhead whale, gray whale, sei whale, fin whale, blue whale,

humpback whale and sperm whale. FEIS at D–9–11. Each of these species is endangered. 50 C.F.R. § 222.23(a). While the blue, sei and sperm whales are found only occasionally in the St. George Basin and the bowhead only rarely, large numbers of fin and humpback whales summer in the basin and most of the gray whale population appears to migrate through it on their way to summer feeding grounds in the Chukchi Sea and Bering Strait. The right whale is nearly extinct in the North Pacific, and its numbers may be too low to allow recovery. Although the small size of its population makes distribution predictions difficult, there have been sightings of this whale in the St. George Basin and the basin is considered to be an important seasonal habitat for this species. FEIS at D–10.

Oil and gas exploration and the development activities associated with it have the potential to affect these whales adversely. Noise from seismic surveys, aircraft and ship traffic, and other activities can cause behavioral disturbances including disruption of migration pathways and displacement from feeding and breeding grounds. FEIS at D–6. Whale contact with oil spills may foul the baleen plates of baleen whales and irritate the skin and eyes of all whales. *Id.* Oil spills may also affect whales indirectly by reducing their food supply. *Id.* The placement of drilling platforms, pipelines, and other structures may also have an effect on whales. *Id.*

The need for a worst case analysis of impacts on whales was addressed early in the environmental assessment process. The Friends of the Earth, in comments on the draft environmental impact statement, suggested that the level of uncertainty and the high likelihood of impacts to at least some of the endangered whales found in the region argued strongly for the preparation of a worst case analysis. FEIS at K–31. The final environmental impact statement specifically addressed and rejected this position. FEIS at V–41.

The review of this issue in the environmental impact statement appears in Part IV, "Review and Analysis of Comments Re-

ceived." The review concludes that a worst case analysis is required only when missing information is essential to a reasoned choice among alternatives. FEIS at V–41. While conceding that there is a dearth of information about the potential effect on endangered whales, the final environmental impact statement determines that there is sufficient information to make a reasoned choice and that the preparation of a worst case analysis "would not significantly contribute to the decision process." FEIS at V–42. This conclusion is based on information found in the impact analysis of the final environmental impact statement itself, FEIS at IV–48–52, and in the Bering Sea regional biological opinion, FEIS at appendix D.

The impact analysis of the final environmental impact statement does in fact contain an extensive discussion of impacts of oil and gas pollution and noise pollution on whales. FEIS at IV–48–52. This discussion, however, consists almost entirely of admissions of lack of knowledge on crucial points. In those few areas where studies have been done the results are characterized as inconclusive and further studies are recommended. The final environmental impact statement admits, for example, that there is no evidence to show that endangered whales are able to detect pollution from hydrocarbons or to avoid oil spills. FEIS at IV–49. Since oil-coated whales have rarely been observed, there is no real evidence of their vulnerability to surface contact with oil. What little evidence there is suggests that they are virtually unshielded from their environment. *Id.* Only two instances of contact between whales and oil spills are contained in the final environmental impact statement. In 1969 the entire northward migration of gray whales passed near the Santa Barbara Channel oil spill in California with no notable increase in the number of shore strandings. *Id.* Analysis of one stranded whale did not indicate crude oil in its tissues, but there is no indication of any attempt to do a detailed study of the incident. Whales were also observed near the Regal Sword oil spill near

Cape Cod, but no evidence was obtained from this incident.

The environmental impact statement also considers the possibility of whales ingesting oil in eating or breathing. Although the explosive ventilation of air through the whale's blowhole is considered to make it unlikely that ingestion of oil or gas condensates would occur in breathing, there is no evidence that this is in fact the case. *Id.* The possibility of inhalation of toxic hydrocarbon gases is admitted. Some research on the effect of oil-coating on baleen whales is being conducted at the present time with preliminary results suggesting an adverse impact. There is, however, insufficient evidence to make predictions. *Id.* Finally, the environmental impact statement admits that the existence of physiological stress resulting indirectly from oil pollution is highly debatable. FEIS at IV–50.

The information on noise pollution is even less satisfactory. Research on this subject has been "limited." *Id.* Although some projections can be made from impacts of outer continental shelf activities off the coast of California on the annual gray whale migration, and observations of apparent impacts of fishing vessel noise on whale populations, the final environmental impact statement concludes that "little definite data exists to verify that . . . gray whales would be unaffected by disturbance . . . such as drilling, seismic exploration, or helicopter traffic." FEIS at IV–51. Even less is known about other whale species than is known about the gray whale. The extent to which exploration and development would induce stress in these whales is characterized as "uncertain" and any predictions as "premature." FEIS at IV–52.

The Bering Sea regional biological opinion in large part reflects this same lack of information. FEIS, appendix D. In addition the regional opinion notes that the low frequency sounds that are most likely to result from petroleum exploration have ef-fects that are difficult to determine and are therefore unknown. FEIS at D–6. The regional opinion also concludes that stress-mediated effects on whales are not merely "uncertain" but "unknown." Finally, the regional opinion cites to ongoing studies that may help answer some of these questions, FEIS at D–7, and recommends that definite studies be undertaken. FEIS at D–6.

The National Marine Fisheries Service, which prepared the Bering Sea regional opinion, characterized its opinion as inconclusive because of the lack of sufficient data. FEIS at D–8. It highly recommended that specific additional biological data be gathered before any conclusions were drawn about the effect of outer continental shelf activities on whales. *Id.* Specific recommendations for research approaches and areas of inquiry were made. *Id.*

The lack of available information relating to seismic impacts on whales is also reflected in the St. George biological opinion. Plaintiffs' exhibit 2.[13] The opinion noted that the sensitivity of whales to seismic disturbances is unknown, although studies are presently being undertaken for bowheads and are proposed for gray whales. *Id.* at 17. It concluded that "openwater geophysical seismic surveys would be likely to jeopardize the continued existence of the gray whale if such activity forced them to alter their normal migration routes or prevented them from using the Unimak Pass migration corridor." *Id.* at 26. This result could be avoided provided exploration activities were properly conducted. *Id.*

In reviewing the decision not to prepare a worst case analysis, I am not allowed to substitute my judgment for that of the agency. *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir.1974). As noted above, the Bureau's compliance with the National Environmental Policy Act and the Council on Environmental Quality regulations that im-

---

**13.** Since the St. George biological opinion was issued after the final environmental impact statement, it cannot be considered as a supplement to it. *Grazing Fields Farm v. Goldsch-* *midt,* 626 F.2d 1068 (1st Cir.1980). I consider it here only as it bears on how much is known about seismic impacts on whales. See pages 1139–1141, supra.

**1152**

plement it are not substantive questions governed by the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) but are procedural. *Id.* They can therefore be overturned only if they have been made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). While strict compliance with these procedures is tempered by the "rule of reason", compliance with procedures must be "to the fullest extent possible." *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1092 (D.C. Cir.1973).

■ The Secretary concluded that there was adequate evidence to allow a reasoned choice among the alternatives. FEIS at V–42. I am forced to conclude that this conclusion will not support careful analysis. The Bering Sea regional opinion establishes beyond question that crucial information about these endangered whales, the impact of oil and gas related activity, and the continued survival of the whales is totally lacking. What little positive data exists indicates that the dangers of oil exploration and development pose a real threat to the whales.

The recommendations and suggestions of the National Marine Fisheries Service, which are said to provide adequate protection to endangered species, amount to little. The "extensive analysis" of the available information relevant to the potential impact on endangered whales contained in the environmental impact statement demonstrates, if anything, the lack of information, scientific or otherwise, concerning the potential impacts on their survival.

A worst case analysis of seismic impacts on endangered whales is not an impossible undertaking. In connection with the 1979 Beaufort Sea Lease Sale, for instance, a worst case analysis was done of impacts on bowhead and gray whales. Beaufort Sea Lease Sale FEIS, Vol. 1, pg. 237–241; plaintiffs' exhibit 10. The plaintiffs here have shown that significant adverse impacts could occur as a result of oil and gas exploration and development activities and that there is sufficient information with which a

reasonable worst case analysis could be prepared.

The recent case of *Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir.1983) presents a situation very much like the present one. In *Sigler,* permits had been sought from the United States Army Corps of Engineers for construction of a deepwater port and crude oil distribution system in Galveston, Texas. The Sierra Club insisted that the environmental impact statement for the project should have contained a worst case analysis of the environmental consequences of a total cargo loss by an oil supertanker in Galveston harbor. The district court decided that a quantitative analysis of this event was beyond the state of the art and that any worst case discussion would have been remote and founded upon uninformed speculation and conjecture. It therefore refused to require its preparation. 532 F.Supp. 1222, 1229–34 (S.D.Texas 1982). The court of appeals reversed, finding that remoteness was not a factor to consider and that reasonable speculation was precisely what was intended by the worst case regulations. 695 F.2d at 974.

The plaintiffs in this case maintain that *Sigler* mandates the preparation of a worst case analysis of oil spills here as well. The *Sigler* case, however, is readily distinguishable in one important respect. Since Lease Sale 70 proceeds in distinct stages, decisions about the environmental consequences of oil spills are not essential to a reasoned choice among the alternatives at this stage. The *Sigler* opinion itself tacitly recognizes this fact. *Id.* at 970. Additional information meeting the National Environmental Policy Act's requirements concerning the environmental consequences of oil spills on whales, may become available at a later time and will still be able to control the Secretary's decisions relating to exploration, development and production. Because of this, I cannot conclude that the missing oil spill information is essential to a reasoned choice among the alternatives at this time. Both the "rule of reason" and the tiering regulations of the Council on Environmental Quality militate against such a result.

The case for a worst case analysis of the effect of noise pollution, however, does exist. Unlike oil pollution, which will become a problem no earlier than the exploration phase, seismic disturbances are possible during the pre-exploration period. 30 C.F.R. §§ 250.2(q), 250.34–1(a)(1).

In making an informed choice among the alternatives, therefore, consideration of the impacts of preliminary exploration and seismic activity on whales was essential. The Secretary therefore had two alternatives. If sufficient information to make a reasoned choice was available, it should have been included in the environmental impact statement. As I have explained above, the environmental impact statement contains almost no information on these seismic impacts. If the information is available, the Secretary should prepare a supplemental environmental impact statement containing the information. If it is not available, he should prepare a worst case analysis. In either case he should reconsider the propriety of his lease sale decision.

## C. THE ENDANGERED SPECIES ACT

As originally enacted the Endangered Species Act required federal agencies to take whatever action was necessary to insure that their actions did not jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536 (1973) (amended 1978); *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In 1978 Congress enacted the Endangered Species Act Amendments and required agencies to insure that their actions were "not likely to jeopardize" the continued existence of these species. 16 U.S.C. § 1536(a)(2); P.L. 95–632, 92 Stat. 3751.

The amended act contains extensive procedural and substantive protections for endangered species. The procedural protections are largely contained in section 7(a) of the act. 16 U.S.C. § 1536(a). Before undertaking any action, a federal agency is required to inquire of the Secretary of the Department of Commerce or the Interior whether any endangered or threatened species may be present in the area of the action.[14] *Id.* § 1536(c). If a species may be present, the agency has 180 days to conduct a biological assessment to determine whether the species is present and may be affected by the action. *Id.*

In addition, the agency's assurance that jeopardy is not likely shall be made after "consultation with and with the assistance of the Secretary." *Id.* § 1536(a)(2). The consultation process is not precisely spelled out in the statute but has been implemented in detail in joint regulations promulgated by the United States Fish and Wildlife Service and the National Marine Fisheries Service.[15] 50 C.F.R. § 402.04.

Whenever a federal agency undertakes an activity that may affect an endangered species, it must make a written request for consultation with either the Fish and Wildlife Service or the National Marine Fisheries Service.[16] *Id.* The agency that requests consultation is required "to conduct the appropriate studies and to provide the biological information necessary for an adequate review." *Id.* § 402.04(c). The agency is required to provide "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

When a request for consultation has been made, the Service must undertake a threshold examination of the available information. 50 C.F.R. § 402.04(e). There are four possible findings:

1. the activity will promote conservation of the species;

2. the activity will not promote conservation, but is not likely to jeopardize the continued existence of the species;

3. the activity is likely to jeopardize; or

4. there is insufficient evidence to determine whether there is jeopardy.

---

**14.** See note 10, *supra.*

**15.** See note 11, *supra.*

**16.** The regulations also provide for informal consultation at the field level. 50 C.F.R. § 402.04(a)(5). Informal consultation may not substitute for the formal procedures described here. *Id.*

*Id.* § 402.04(e), (f). The term "jeopardize the continued existence of" is by regulation defined as

> to engage in an activity or program which reasonably would be expected to reduce the reproduction, numbers, or distribution of a listed species to such an extent as to appreciably reduce the likelihood of the survival and recovery of that species in the wild.

*Id.* § 402.02.

The Service has 60 days from the initiation of consultation in which to conclude the threshold examination and issue a biological opinion detailing its conclusions. *Id.* § 402.04(e). The biological opinion must be accompanied by a statement of the facts and documents on which they are based and explain in detail how the proposed action affects the species. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.04(e)(4). It must also contain reasonable and prudent alternatives which can be taken to avoid jeopardy to the species. *Id.*

Consultation may also be initiated by either of the two Services if they identify any activity of a federal agency that may affect an endangered or threatened species. 50 C.F.R. § 402.04(a)(4). Informal consultation at the field level between the Services and other federal agencies is also possible but may not substitute for formal consultation. *Id.* § 402.04(a)(5).

If the result of consultation is a finding of insufficient information to make the determination of whether jeopardy exists, the federal agency must conduct appropriate biological studies and surveys to gather the missing information. *Id.* § 402.04(f). When the information has been compiled, the Service must reconsider the question of jeopardy. *Id.*

■ After formal consultation has ended and a biological opinion has issued, the decision whether or not to proceed with the project rests ultimately with the Secretary. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1303–04 (8th Cir.1976); 50 C.F.R. § 402.-

04(g). He must insure that agency actions are not likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2). The 1978 amendments have not changed the agency's duty to use "all methods and procedures which are necessary ... to prevent the loss of any endangered species, regardless of the cost." *Roosevelt Campobello International Park v. United States Environmental Protection Agency,* 684 F.2d 1041, 1049 (1st Cir.1982) *quoting TVA v. Hill,* 437 U.S. 153, 185, 188 n. 34, 98 S.Ct. 2279, 2297, 2299 n. 34, 57 L.Ed.2d 117.[17] The amendments "continue to give the benefit of the doubt to the species." H.Conf.Rep. No. 96–697, 96th Cong., 1st Sess. 159 *reprinted in* [1979] U.S. Code Cong. & Ad.News, 2557, 2572, 2576.

■ Compliance with the affirmative mandate of 7(a)(2) is aided by the requirement that the Secretary must make his assurance of "not likely to jeopardize" based on the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2). This requirement assures that a decision with potentially adverse consequences for an endangered species will be made after full and careful review of the then available and relevant data. This duty is violated if the agency fails to initiate feasible and necessary tests or studies, *Roosevelt Campobello,* 684 F.2d at 1052, or if the agency initiates tests and studies and then acts prematurely before the results are known. *Conservation Law Foundation v. Watt,* 560 F.Supp. 561, 572 (D.Mass.1983).

■ The statute flatly forbids agency action which is known to be likely to jeopardize an endangered species. *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Neither the statute nor the regulations, however, prohibits agency action when the information necessary to establish jeopardy is unavailable. *North Slope Borough v. Andrus,* 486 F.Supp. at 352. Instead the regulations impose a duty on the agency to gather the needed information. 50 C.F.R. § 402.04(f). According

---

**17.** Subsections 1536(e)–(p) of the Act set out procedures whereby an agency may be exempt-

ed from compliance with the Act. *See, also,* 50 C.F.R. §§ 450.01–453.06.

to the legislative history of the 1978 amendments:

> As currently written ... the law could be interpreted to force the Fish and Wildlife Service and the National Marine Fisheries Service to issue negative biological opinions whenever the action agency cannot guarantee with certainty that the agency action will not jeopardize the continued existence of the listed species or adversely modify its critical habitat. The amendment will permit the wildlife agencies to frame their section 7(b) opinions on the best evidence *that is available or can be developed during consultation.* If the biological opinion is rendered on the basis of inadequate information then the Federal agency has a continuing obligation to make a reasonable effort to develop that information.

> This language continues to give the benefit of the doubt to the species, and it would continue to place the burden on the action agency to demonstrate to the consulting agency that its action will not violate [section 7(a)(2)]... If a Federal agency proceeds with the action in the face of inadequate knowledge or information, the agency does so with the risk that it has not satisfied the standard of section 7(a)(2) and that new information might reveal that the agency has not satisfied the standard of section 7(a)(2).

H.Conf.Rep. No. 96–697, 96th Cong., 1st Sess., 159 *reprinted in* [1979] U.S.Code Cong. & Ad.News, 2557, 2576 (emphasis added); *see also, North Slope Borough v. Andrus,* 642 F.2d at 610 n. 131; 486 F.Supp. at 355 (remarks of Senator Culver).

Because section 7(a) does not by itself adequately protect an endangered species when there is insufficient evidence to determine whether it is in danger or when an initial finding of no jeopardy is called into question by later studies or new information, Congress has provided additional pro-tection in section 7(d). Section 7(d) provides that

> After initiation of consultation required of this section, under subsection (a)(2) the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d). The primary purpose of this section is to guarantee that no irreversible decisions are made until a definitive biological opinion can be prepared. If the biological opinion then determines that the proposed action will threaten an endangered species, section 7(a)(2) will operate to protect the species. If the opinion reveals that the action will not threaten any endangered species, section 7(d) will not prohibit the commitment of resources. 486 F.Supp. at 355.

■ A negative biological opinion, however, does not render section 7(d) inapplicable. If new information develops which indicates that an endangered species might be threatened, section 7(d) would prohibit the further irreversible or irretrievable commitment of resources until consultation is reinitiated and a new biological opinion prepared. *Id.*

Typically, the "agency action" involved will be readily discernible.[18] Since the Outer Continental Shelf Lands Act segregates the entire range of contemplated outer continental shelf activities into discrete stages, however, conceptualization of the appropriate "agency action" may present a difficult problem. For example, must the Secretary insure at the leasing stage that activities in the exploration and production stage are not likely to jeopardize the existence of endangered whales? As a practical matter, the information necessary for such a deter-

18. *See e.g., TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (completion of Tellico Dam); *Roosevelt Campobello International Park v. EPA,* 684 F.2d 1041 (1st Cir.1982) (issuance of National Pollution Discharge Elimi-nation Permit); *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir.1976) (construction of Meramac Park Lake Dam); *National Wildlife v. Coleman,* 529 F.2d 359 (5th Cir.1976) (construction of segment of interstate highway).

mination would not then be available. Alternatively, can the Secretary, in consultation with the National Marine Fisheries Service, consider only those activities related to the leasing stage, disregarding the consequences of subsequent activities for which information is then available and ignoring known threats to endangered species?

The court of appeals for this circuit has not yet addressed this specific issue, but authoritative decisions from other circuits have fashioned an approach consistent with the purposes animating both acts. *See, North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980); *Conservation Law Foundation v. Andrus,* 623 F.2d 712 (1st Cir.1979). In *Conservation Law Foundation,* the court held that the Endangered Species Act and the Outer Continental Shelf Lands Act were complimentary statutes and that the Endangered Species Act continues to apply to major actions taken by the Secretary after the lease sale is held. 623 F.2d at 715. Should it appear after the lease sale that outer continental shelf activities would violate the Endangered Species Act standards, the leases contain an implied term that the agency will act lawfully and take whatever steps are necessary, including cancellation of the leases, to assure compliance with section 7(a)(2). 623 F.2d at 715, n. 3.

In *North Slope Borough,* the court confronted the problem of attributing a legal definition in the context of outer continental shelf activity to the term "agency action." [19] After assessing the concerns motivating the enactment of the Endangered Species Act and the Outer Continental Shelf Lands Act, the court harmonized the statutes by concluding:

> ... The segmented approach of OCSLA does not attenuate ESA's notion of "agency action." It does, however, qualify somewhat the broadest practical effect the term could have. Mandatory stage-by-stage review prevents the telescoping of any and every projected hazard to

endangered life and to the environment into one overwhelming statutory obstacle. The OCSLA standards are not less strict, they simply rely more on achieving compliance than on exacting proscription. By ensuring graduated compliance with environmental and endangered life standards, OSCLA makes ESA requirements more likely to be satisfied both in an ultimate and a proximate sense.

> In short, "agency action" in this case may signify the lease sale and all subsequent activities, but satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof.

642 F.2d at 609 (footnote omitted).

This approach is both sensible and sensitive to the potentially competing values reflected in the Endangered Species Act and the Outer Continental Shelf Lands Act. The leasing stage presents a unique opportunity to take a hard look at the anticipated and potential risks to endangered species at every stage of activity.

> ... decisions made at the lease sale stage ... establish the basic scope and charter for subsequent development and production ... critical decisions are made as to the size and location of the tracts, the times of the sale, and the stipulations to which the leases would be subject.

*State of California v. Watt,* 683 F.2d 1253, 1260 (9th Cir.1982). Both the Secretary and the National Marine Fisheries Service would be remiss to forego this excellent opportunity to offer guidance in shaping the parameters within which later outer continental shelf activities should occur. The legislative history is in accord:

> The earlier in the progress of a project a conflict [between a species and the project] is recognized, the easier it is to design an alternative consistent with the requirements of the act, or to abandon the proposed action.

**19.** The Endangered Species Act defines "agency action" as "any action authorized, funded,

or carried out by such agency." 16 U.S.C. § 1536(a)(2) (Supp.1982).

*North Slope Borough,* 642 F.2d at 608, *quoting from* Cong.Rec., July 17, 1978 at S10,896 (remarks of Senator Culver).

But this affirmative duty to consider the full range of outer continental shelf activities must be tempered by the realization that as outer continental shelf activities progress, identification of particular sources of jeopardy to endangered species, and development of mitigation plans will be guided less by abstraction and speculation than by recourse to an expanding base of relevant data. The requirement of further consultation at later stages assures that activities incident to those stages, as well as the entire outer continental shelf plan, are conducted in compliance with section 7(a)(2) and section 7(d) without unnecessarily sacrificing the national goal of oil and gas development.[20]

It is likely that no mechanical test can be formulated which will be appropriate for every action which the Secretary may encounter at any particular phase of an outer continental shelf project. He is, of course, required to determine possible dangers and consider possible alternatives at the earliest feasible opportunity. 486 F.Supp. at 351. On the other hand, the inherent nature of outer continental shelf leasing requires that much of the information relating to environmental consequences will not be available at the early stages of the project. Each lease sale will likely present its own unique development program and unique environmental risks. In some cases, the danger to a species from exploration or oil spills and blowouts may be capable of accurate prediction before leases are issued. This wide range of possibilities and variables dictate that the controlling principles be applied on a case to case basis.

**20.** While segregated stages present the possibility that investment approved at an early stage will later be lost should an insurmountable environmental obstacle arise, that is a risk accepted by the oil companies and, in part, by Congress when it enacted the Outer Continental Shelf Lands Act. *North Slope Borough,* 642 F.2d at 611; *cf. TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

■ I conclude that the Endangered Species Act requires the Secretary to use the best data available and to continue acquiring information until an affirmative finding of no jeopardy can be made. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.04(f). He cannot defer investigations when it is possible and necessary to undertake them. Under section 7(d), he may allow projects to proceed even when information about jeopardy is missing, as long as he insures that no actions are taken that will have irremediable consequences.

On June 6, 1980, the Secretary of the Interior requested formal consultation with the National Marine Fisheries Service about the impact of oil and gas activities on endangered whales in the Bering Sea. The resulting biological opinion, covering a total of ten lease sales, was released on January 22, 1982.[21] It has been incorporated into the final environmental impact statement for Lease Sale 70. FEIS, appendix D.

Although the entire range of outer continental shelf activities from pre-leasing activities through production were considered in the course of the consultation, the opinion is expressly limited to activities associated with the leasing and exploration phases of development. FEIS at D–3. The activities reviewed include pre-lease geophysical surveys and stratigraphic test wells, the lease sale itself, post-lease geophysical surveys, and exploratory drilling and its associated activities. *Id.*

The regional biological opinion considered impacts on all eight species of endangered whales.[22] After discussing what is known about the distribution and habits of these whales in each lease sale area, the opinion noted that there are three types of hazards to whales in outer continental shelf activities:

**21.** See note 7, *supra.*

**22.** The endangered whales are the blue whale, fin whale, sei whale, sperm whale, humpback whale, bowhead whale, right whales, and gray whale. See 50 C.F.R. § 222.23.

1. physical impacts caused by structures;
2. behavioral impacts caused by noise; and
3. oil spill impacts.

Little danger was anticipated from physical impacts. The opinion considered impacts from noise and oil spills a problem, however. It noted that the low frequency sounds typical of oil exploration had unknown effects on whales, but were known to cause stress in other marine mammals. The extent to which whales are susceptible to stress is also unknown. The available information also indicated that oil spills have the potential to affect whales severely.

The opinion concluded that available information was insufficient to determine whether exploration activities were likely to jeopardize whales since important information on planned activities was not available. FEIS at D–7. The opinion also stated that activities could be planned to avoid jeopardizing the whales and stressed the need for future consultation for each individual lease sale. *Id.* In the interim, three reasonable and prudent alternatives were suggested:

1. no leasing should be allowed in Bering Strait or Chirikov Basin;
2. aircraft and vessel traffic should be controlled to prevent noise disturbances;
3. drilling restrictions should be imposed in Norton Sound and in the vicinity of Unimak Pass during the spring and fall whale migrations.

*Id.* at D–9. Recommendations were made for further studies, for the establishment of a biological task force, and for inclusion of harassment guidelines in the final notice of the sale. *Id.*

The Secretary responded to the drilling restriction recommendation in the comments section of the final environmental impact statement. FEIS at V–42. Based on the low conditional probability of an oil spill entering Unimak Pass during the spring and fall and the short time whales would be present there, he concluded that the risk of contact between whales and oil spills was so low that drilling restrictions were not required. *Id.* He indicated that

consultation specifically directed at Lease Sale 70 had been re-initiated to determine if the conclusions of the regional opinion were still valid. *Id.*

The biological opinion for the St. George Basin proper was released on March 9, 1983, two days after publication of the final notice of sale. Plaintiffs' exhibit 2. The St. George opinion reaffirmed all of the conclusions of the Bering Sea regional opinion, but re-evaluated its conclusions on the basis of additional information that had recently become available. In particular, two right whales had been sighted near St. Matthew Island in the summer of 1982, the first Bering Sea sighting in recent years. *Id.* at 10. Additional migration routes for the gray whale in the lease sale area were also reported. *Id.* at 7.

As a result of the oil spill trajectory analysis in the final environmental impact statement, the St. George opinion was able to consider the risk from oil spills in much greater detail than the regional opinion. The St. George opinion found little danger during the summer or winter. In the winter, only bowhead whales were likely to be found in the Bering Sea and this species would not be near the lease sale area. In the summer, the projected oil trajectories did not reach the Pribilofs or Unimak Pass where the only known whale concentrations were located. *Id* at 25. Spring and fall, however, were found to be times of oil spill hazard to both right and gray whales.

During spring and fall the gray whale population passes through Unimak Pass and across the outer continental shelf between Nunivak Island and the Alaska Peninsula. *Id.* The opinion concluded that a major oil spill or uncontrolled blowout occurring at either of these times might intercept large numbers of migrating whales and would be likely to cause jeopardy. An oil spill or blowout would also jeopardize the right whale because of the extremely small number of these whales. *Id* at 22.

Drilling noises were not considered dangerous to any species. The effect of geophysical seismic surveys, however, "would

be likely to jeopardize the continued existence of the right whale if such activity disturbed its feeding, mating or calving activities." *Id.* at 23. Openwater seismic surveys would also be likely to jeopardize the gray whale if they forced them "to alter their normal migration routes or prevented them from using the Unimak Pass migration corridor." *Id.* at 26.

The opinion believed that there was also a possibility of jeopardy to both the gray and right whales from the cumulative effect of outer continental shelf activities. *Id.* at 24, 27. There was not enough available data, however, to make a definite finding of jeopardy from cumulative impacts. *Id.*

The St. George opinion did not repeat the regional opinion's demand for seasonal drilling restrictions in Unimak Pass. It did recommend additional studies of whale distribution and behavior, of the effect of spilled oil and noise on whales, and of the cumulative impacts from development. *Id.* at 28–29. As reasonable and prudent alternatives, it suggested that the Secretary guarantee that no spilled oil be present when gray or right whales were present and that exploratory drilling and its associated activities be conducted "only at times and in locations where [the Department of the Interior] can ensure that [Unimak Pass, the North Shore of the Alaska Peninsula and outer Bristol Bay] will remain free of spilled oil." *Id.* at 31. It also suggested the inclusion of an information to lessees clause designating these locations as areas of special biological sensitivity. *Id.* Because of the possibility that geophysical seismic noises might affect gray whale behavior, it recommended that seismic operations be carried out

> only and in such a manner ... that does not disturb activities essential to the life history of right whales (i.e. mating, calving, feeding). In addition, such operations should be conducted in waters near Unimak Pass only in such a manner that

does not disturb the spring and fall migrations of gray whales through Unimak Pass.

*Id.* at 32. The recommendation of the regional opinion that harassment guidelines for vessel and aircraft operators be adopted and that a biological task force be established were both repeated. *Id.* at 34. An additional suggestion that aircraft operators maintain a 1500 foot minimum altitude when flying over areas occupied by whales was also included. *Id.*

Plaintiffs made three claims under the Endangered Species Act:

> 1. the Secretary violated the act by issuing the final notice of sale before he received the St. George opinion;
>
> 2. the Secretary failed to use all methods and procedures to ensure that there is no likelihood of jeopardy to endangered whales;
>
> 3. the lease sale is an irreversible or irretrievable commitment of resources made before the end of consultation violating section 7(d).[23]

The standard of judicial review of these claims is limited to whether the Secretary's decisions were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir.1976) *cert. denied* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Village of Kaktovik v. Corps of Engineers,* 12 E.R.C. 1741, 1746 (D. Alaska 1978).

1. Premature Issuance of the Final Notice of Sale:

The Endangered Species Act does not expressly require the Secretary to await formal issuance of the biological opinion before proceeding with the final notice of sale. Under section 7(a)(2), he must consider the best scientific and commercial data available and make his decision in light of the conclusions and recommendations in the biological opinion. 16 U.S.C. § 1536(a)(2); *Roosevelt Campobello,* 684

---

**23.** Plaintiffs originally made two additional claims against the National Oceanic and Atmospheric Administration. These claims have been dropped by stipulation of the parties. See, note 2, *supra.*

F.2d at 1049. Therefore, the plaintiffs must show not that the final notice of sale preceded the formal issuance of the biological opinion, but that the Secretary failed to consider the information contained in that opinion.

■ To support their claims, plaintiffs rely on the questionable timing of the Secretary's decision and on the fact that a Freedom of Information Act request revealed no written communication between the Department of the Interior and the National Marine Fisheries Service during the period between the beginning consultation and the Secretary's decision. Plaintiffs' exhibits 14, 15. From this, plaintiffs conclude that the Secretary did not consider the contents of the biological opinion. Specifically, plaintiffs allege that the Secretary acted without knowledge of the recent sighting of right whales, the fact that the gray whales' migration route transects the eastern portion of the lease sale, and the opinion's conclusion that seismic activity is likely to jeopardize both the right and gray whales.

The federal defendants rely on a memorandum to the record from the Deputy Director of the Minerals Management Service stating that the Minerals Management Service had informally received an early draft of the St. George opinion and that on February 28, one week before the issuance of

the final notice of sale, the "Secretary was briefed on the preliminary results of the biological opinion." Federal defendants' exhibit 2. Plaintiffs have offered no evidence to show that this briefing did not take place, that the draft was not received, or that the draft differed in important ways from the final opinion.[24] I conclude that the Secretary considered the information in the final biological opinion before issuing the final notice of sale.

**2. Violations of Section 7(a)(2):**

■ In considering plaintiffs' claim that the Secretary failed to use all methods and procedures to insure that there is no likelihood of jeopardy to the gray or right whale, it must be remembered that the decision whether or not to proceed with a proposed project and on what terms rests ultimately with the Secretary. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1303–04 (8th Cir.1976); 50 C.F.R. § 402.04(g). The biological opinion is accorded substantial weight as evidence of the Secretary's compliance with the Endangered Species Act. *Roosevelt Campobello,* 684 F.2d at 1049. If the Secretary adopts the reasonable and prudent alternatives suggested by the biological opinion, he has fulfilled his obligations under section 7(a)(2). *North Slope Borough,* 642 F.2d at 610.[25] If he deviates from them, he does so subject to the risk that he has not satisfied the standard of

---

24. The draft opinion received by the Minerals Management Service is not identical to the final version of the St. George opinion. See federal defendants' exhibit 2. The reasonable and prudent alternatives section of the draft opinion, for example, omits the reference to severe impacts from oil spills to right whales that is contained in the final St. George opinion. In all other respects, however, the reasonable and prudent alternatives sections for oil spill and blowout hazards are identical for the two documents. The reasonable and prudent alternatives sections on the geophysical seismic disturbance in the draft opinion contains two suggestions that were dropped from the final opinion. The first is a recommendation that the Department of the Interior "review all geophysical seismic permit applications to determine if consultation pursuant to section 7(a)(2) is necessary." The second is the suggestion that geophysical seismic operations not be allowed near Unimak Pass during the spring and

fall whale migrations unless it could be shown that they would not disturb the whales. The corresponding provision in the final St. George opinion suggests only that operations be conducted in a manner that does not disturb the whales. Plaintiffs' exhibit 2 at 32. Since the reasonable and prudent alternatives in the final St. George opinion are less stringent than those in the draft opinion, the Secretary's decision was not prejudiced by having only the draft opinion.

25. Plaintiffs originally challenged the adequacy of the St. George Basin biological opinion. Plaintiffs' exhibit 25, paras. 70, 71. These claims were later dropped by stipulation of the parties. See note 2, *supra.* Whether the reasonable and prudent alternatives contained in the final St. George biological opinion are adequate to protect the gray and right whale is therefore a question that is not before me.

section 7(a)(2). H.R.Rep. No. 1625, 95th Cong., 2d Sess., 632 *reprinted in* [1978] U.S. Code Cong. & Ad.News 9453, 9462.

The issue then turns on whether the Secretary has implemented the reasonable and prudent alternatives suggested by the National Marine Fisheries Service.

### a. *Oil Spill Risk Alternatives*

Plaintiffs maintain that the Secretary has failed to adopt any measures that implement the reasonable and prudent alternatives proposed in the St. George opinion.[26] The record contains no document in which the Secretary responds directly to the St. George opinion, but several of the clauses in the final notice of sale respond to similar concerns raised in the Bering Sea regional opinion.

Several recommendations of the St. George opinion were adopted in substantially the form recommended in the opinion. Information to lessee clause (n) announced the formation of the Bering Sea Regional Biological Task Force with the National Marine Fisheries Service as one of its members. *See,* Plaintiffs' exhibit 2 at 32. Clause (j) identified Unimak Pass and the Pribilof Islands, as well as Moffett, Izembek, and Nelson Lagoons, as areas of special biological sensitivity and required their protection in oil spill contingency plans. *See, id.* at 31; Alaska OCS order no. 7; 30 C.F.R. § 250.34–3.

Information to lessees clause (1) advises lessees that the regional supervisor of the Minerals Management Service retains authority to suspend drilling activity whenever migrating whales are near enough to be subject to the risk of spilled oil. It states that gray whales migrate through the basin from April to June and in October and November and notifies lessees that the regional supervisor may order the cessation of exploratory drilling during these times.

Lease stipulation 4 authorizes the regional supervisor to require the lessees to conduct environmental surveys to determine the extent and composition of biological populations requiring extra protection. He may also require the lessees to relocate, modify or temporarily stop operations when necessary to protect biological populations.[27]

Of primary concern in both biological opinions was that consultation be continued as additional information about the relation between whales and outer continental shelf activities become available. Plaintiffs' exhibit 2 at 34; FEIS at D–7, 9. Given the scarcity of available information, this consultation is probably required by regulation.[28] 50 C.F.R. § 402.04(h). The Secretary has agreed to provide the National Marine Fisheries Service with copies of all plans for exploratory drilling and all seismic permits. This will allow the National Marine Fisheries Service to determine presently unknown hazards to whales and assist the Secretary in carrying out the recommendations of the two biological opinions. *See,* 50 C.F.R. § 402.04(h).

Under *North Slope Borough v. Andrus,* "satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof." 642 F.2d 589. I conclude that, contrary to plaintiffs' assertion, the Secretary has taken measures at this stage that, if diligently pursued, will assure ultimate compliance with section 7(a)(2). He has

26. Plaintiffs also claim that the Secretary acted arbitrarily in failing to adopt the seasonal drilling restrictions in the regional biological opinion. FEIS at D–9. This suggestion did not appear in the St. George Basin biological opinion however and the Secretary was not obliged to adopt it.

27. This stipulation was apparently intended only to identify and protect biological populations "other than those" presently identified.

FEIS at II–9–10. By its language, however, it also protects known populations of whales.

28. The two biological opinions finding jeopardy to endangered whales from spilled oil, the conclusion of both the National Marine Fisheries Service and the Secretary that needed information is lacking, and the contemplated addition of new data about drilling, all strongly suggest that formal consultation is required at the exploration stage.

provided a means of gathering additional data and advice that will enable him to respond effectively at the exploration stage to the identified risk from spilled oil. I find that he has substantially adopted the reasonable and prudent alternatives recommended by the National Marine Fisheries Service. While it is possible that more stringent measures could have been taken to protect these whales, his failure to do so does not constitute a clear error of judgment.

b. *Noise Pollution Alternatives*

The final notice of sale also contains restrictions on seismic activities and other sources of noise pollution. The Secretary has taken two actions to control these hazards. Information to lessee clause (k) adopts the recommendation of the St. George opinion that aircraft maintain a minimum 1500 foot elevation when whales are likely to be in the area. Plaintiffs' exhibit 2 at 34. Because the regulations allow some seismic exploration without a permit and before the submission of exploration plans, 30 C.F.R. § 250.34–1(a)(1), the Secretary has issued an order requiring lessees to give two weeks prior notice of preliminary survey work. Ad.Rec. 30.

The St. George opinion concluded that the Secretary could plan outer continental shelf activities to avoid jeopardy to gray and right whales from seismic activity. Plaintiffs' exhibit 2 at 23, 26. In its reasonable and prudent alternatives sections, the St. George opinion suggested

> that geophysical seismic operations should be conducted in or near the Sale 70 area only and in such a manner that does not disturb activities essential to the life history of right whales (i.e. mating, calving, feeding). In addition, such operations should be conducted in waters near Unimak Pass only in such a manner that does not disturb the spring and fall migrations of gray whales through Unimak Pass.

*Id.* at 31–32.

With regard to seismic impacts from activities after the approval of the explora-

tion plans, the Secretary has fully complied with this suggestion. The information from the Environmental Reports (Exploration) and from the continuing research required by the Endangered Species Act insure that more information on these whales will be available at the time the plans are submitted for approval. 30 C.F.R. §§ 250.-34–1(a)(2)(i); 250.34–3(a). At the same time the Secretary will be better able to evaluate the proposed activities, their location, and their timing. The Secretary has retained full authority to regulate whatever seismic activities are contemplated at that time. Judicial review of the exploration plans will also be available before any activity occurs under them. 43 U.S.C. § 1349. With respect to exploration stage seismic activities, therefore, the Secretary has complied both with the statute and with the suggestions of the St. George opinion.

 I cannot draw the same conclusion for the preliminary seismic activities. The act requires the Secretary to "insure" that activities are not likely to jeopardize endangered species. 16 U.S.C. § 1536(a)(2). The legislative history of the act discloses that the Secretary's compliance with this mandate must be measured by his conformity with the reasonable and prudent alternatives of the biological opinion. When the Secretary deviates from these suggestions he does so at his peril. H.R.Rep. No. 1625, 95th Cong., 2d Sess., 632 *reprinted in* [1978] U.S.Code Cong. & Ad.News 9453, 9462.

The St. George biological opinion finds jeopardy from seismic activity for both the gray and right whale, but believed that the Secretary could plan activities to avoid jeopardizing the two species. Plaintiffs' exhibit 2 at 23, 26. I read the word "plan" to require the Secretary to formulate and incorporate restrictions on preliminary seismic activity that will insure that the jeopardizing circumstances outlined in the St. George opinion do not occur.

What the Secretary has done instead is to issue an order to the lessees requiring them to give him notice of any preliminary seismic activities the lessees plan to conduct so that he may assess their environmental im-

pact. While this may insure the Secretary's ability to cope with future problems as they occur, it can hardly be said to amount to a plan by which jeopardy can be avoided.

Unlike the National Environmental Policy Act, which is essentially procedural, the Endangered Species Act includes substantive provisions. It does not merely direct the Secretary to consider the jeopardy to endangered species, it requires him to insure that federal actions are not likely to jeopardize them. The Secretary's order in response to the recommendation in the St. George biological opinion insures only that the problem will be given attention at a later date.

■ The Endangered Species Act must, of course, be considered in light of the full range of Outer Continental Shelf Lands Act checks and balances. *North Slope Borough,* 642 F.2d at 609. Thus, the Secretary is not in every instance required to insure that exploration stage activities will not jeopardize a species until the exploration stage is reached. This rule is reasonable since administrative and judicial review of the environmental consequences of exploration remains available[29] before any non-preliminary exploration is attempted. Neither the outer continental shelf regulations nor the Secretary's April 15 notice to lessees, however, allows for review. 30 C.F.R. § 250.-34–1(a)(1); Ad.Rec. at 30. There is therefore a real danger that these species might be jeopardized by preliminary seismic activities without review of the adequacy of measures taken for their protection.

In short, the Endangered Species Act requires the Secretary to insure that his actions do not jeopardize the continued existence of endangered whales. The St. George biological opinion suggested reasonable and prudent alternatives for the Secretary to comply with this duty. The record of the Secretary's actions to the extent I am able to perceive, consisting primarily of the final environmental impact statement, the final notice of sale, and the April 15 notice to lessees, complies with these suggested alternatives. The administrative record contains no justification by the Secretary for failing to comply with the suggestions of the National Marine Fisheries Service. I therefore conclude that the Secretary's actions under section 7(a)(2) were in this regard arbitrary.

3. Section 7(d) Claims:

■ Section 7(d) allows an agency to proceed with a project as long as it makes no irreversible or irretrievable commitment of resources. 16 U.S.C. § 1536(d). The uniform conclusion of the reported cases that have considered the question is that lease sales do not constitute an "irreversible or irretrievable commitment of resources" within the meaning of section 7(d). *Conservation Law Foundation,* 623 F.2d at 715; *North Slope Borough,* 642 F.2d at 611; *State of California by and through Brown v. Watt,* 520 F.Supp. 1359, 1387 (C.D.Cal. 1981). I agree with the analysis of these cases. While the Secretary has violated section 7(a)(2), he has made no commitment which forecloses his ability to comply with that section in the future.

### D. INJUNCTIVE RELIEF

■ Injunctions are not to be issued as a matter of course. *Harrisonville v. U.S. Dickey Clay Mfg. Co.,* 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933). They are appropriate only when a court's equitable intervention is necessary to protect the rights of the parties against otherwise irremediable injury. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975).

■ In deciding whether injunctive relief is appropriate, a court must balance the benefits and injuries to each of the parties and consider the public consequences of its

---

**29.** Intervenors concede that in this case an environmental impact statement is required before approval of exploration plans. Additionally, the Secretary has agreed to submit exploration plans and seismic permits to the National Marine Fisheries Service for consultation, and the Secretary must issue his consistency determination that the exploration plan is consistent with the Alaska Coastal Management Program.

action. *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944); *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

■ Congress, of course, has the authority to guide the courts' discretion in equitable matters, *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Plaintiffs, relying on *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), and *State of California v. Bergland,* 483 F.Supp. 465 (E.D.Cal.1980) *aff'd in part, rev'd in part sub nom. State of California v. Block,* 690 F.2d 753 (9th Cir.1982), contend that Congress has exercised that power here. They suggest that once a substantial violation of either the National Environmental Policy Act or the Endangered Species Act has been shown, an injunction should issue without consideration of the traditional equitable balancing.

The applicability of traditional injunction rules to environmental cases was recently considered by the Supreme Court in *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The Court noted that congressional departure from traditional equitable principles is not to be lightly assumed. *Id.* 102 S.Ct. at 1803. The full range of remedies available to a court will be foreclosed only when that conclusion is necessary to vindicate the objectives of the act. *Id.* 102 S.Ct. at 1804.

There is language in *TVA v. Hill* implying that an injunction must always issue when a substantial violation of section 7(a)(2) of the Endangered Species Act is found. *See,* 437 U.S. at 193–95, 98 S.Ct. at 2301–02. The language of *TVA v. Hill,* however, must be considered in light of the facts of that case. In *TVA v. Hill,* the parties had agreed that completion of the dam would have eliminated the snail darter. 102 S.Ct. at 1805. Refusing to enjoin completion would therefore have ignored the whole purpose of the Endangered Species Act. *Id.*

■ I conclude that an injunction need not always issue for a violation of the Endangered Species Act regardless of the circumstances, but under the facts of this case, I conclude an injunction is required. The St. George biological opinion has found that seismic activities are likely to jeopardize the continued existence of the gray and the white whale.[30] Since the Secretary has failed to take appropriate measures to insure against this eventuality, an injunction must issue to avoid endangering these two species during seismic activities.

I have considered the application of *Romero-Barcelo* to the granting of injunctions under the National Environmental

---

**30.** The St. George opinion does not precisely distinguish between the effects of preliminary seismic activities which may be undertaken by the lessees before the approval of their exploration plans and seismic activities which will take place after the exploration plans are approved. Plaintiffs' exhibit 2 at 16–17, 26, 30. *et passim;* 30 C.F.R. 250.34–1(a)(1); *cf.* defendants-intervenors' exhibit 3. The reasonable and prudent alternatives are phrased broadly in terms of "geophysical seismic noise." I find that this term when considered in light of the St. George opinion, as a whole, includes seismic noise from both preliminary activities and exploration phase activities.

The intervenors have filed the affidavit of E.W. Heckart, manager of geophysics for Shell Oil Company, outlining the geophysical activities typically undertaken by Shell Oil. Defendant-intervenors' exhibit 2. He admits that the preliminary seismic activity that Shell performs may be done without a permit, but is confined to relatively limited areas, is confined to shal-

low strata, and generates relatively low noise levels. *Id.* at 3. But see, ad. rec. 30 (notice required for preliminary activities in St. George Basin). He concludes that interaction with whales is less likely during this period than later deep strata exploration.

Evaluation of the hazard to whales posed by different types of activities is a matter within the expertise of the National Marine Fisheries Service and something which I do not now review. There is no evidence in the record before me to indicate that the National Marine Fisheries Service considered these preliminary activities any less hazardous to whales than exploration plan activities; nor is there any evidence that the Secretary's failure to adopt more stringent protective measures for preliminary activities was based on a decision that these activities posed less of a threat to the gray and right whales. I therefore conclude this affidavit is irrelevant to my review of the Secretary's action.

Policy Act before. In *People of the Village of Gambell, et al. v. Watt,* N83–003 (D.Alaska 1983), I rejected the analysis of *California v. Bergland* and held that traditional equitable principles applied to injunctions issued under this act. Slip opinion at 5–6. Nothing that has been argued in this case has convinced me that this conclusion was incorrect and I adopt it here. I have therefore considered the harm to plaintiffs, defendants, and intervenors as well as the public interest.

Plaintiffs here undertake to represent the public interest in concerns arising out of environmental impacts upon the endangered whales. This matter is of great public concern as can be seen by the legislative enactment that Congress has seen fit to promulgate to protect them. *See, e.g.,* 16 U.S.C. §§ 1531–43 (Endangered Species Act); 16 U.S.C. §§ 1361–1407 (Marine Mammal Protection Act).

The federal defendants have not established that substantial harm would be suffered by the federal government or the people of the United States by issuance of an injunction. Moreover, the injunction will, by its own terms, expire upon compliance by the Secretary with the specific conditions imposed.

The intervenors maintain that they will be harmed by an injunction since their bidding strategies will be compromised if the Secretary decides to hold a new sale. The intervenors have, however, had adequate warning of this possibility well before the sale since the final notice of sale for Lease Sale 70 allows the tracts to be withdrawn at any time before written acceptance of the bids, and reserves to the United States the right to reject any and all bids. Ad. rec. 20 at 4. The possibility that the sale might have to be redone was also raised at oral argument on plaintiffs' motion for a preliminary injunction. Intervenors elected at that time to argue that the opening of the bids should go forward pending the outcome of this suit.

I conclude that the public interest in full disclosure of possible dangers to gray and right whales outweighs both the public harm and the inconvenience to the intervenors that would follow from delaying the sale.

E. CONCLUSION

In summary, I have examined in detail the claims of the plaintiffs, the arguments of the parties, and all of the documentation for this sale that has been submitted. I conclude that the Secretary has given serious consideration to most of the environmental consequences of this sale. But I have determined that his consideration of issues relating to the survival of right and gray whales is deficient in several respects and fails to conform to the requirements of the law.

In particular, I find that the final environmental impact statement is adequate in all respects except for its consideration of the dangers posed to whales from preliminary seismic activity. This deficiency may be remedied by preparing a worst case analysis for these dangers or by preparing a supplemental environmental impact statement. The choice between these two alternatives will depend upon whether sufficient information about impacts is available to prepare a supplemental environmental impact statement.

I find that the Secretary's decision to proceed with the sale, after consultation with the National Marine Fisheries Service on the terms found in the final notice of sale, complied with his duties under section 7(a)(2) and section 7(d) of the Endangered Species Act for all the endangered species encountered in the St. George Basin except the gray and right whales. He has, however, failed to take sufficient action to carry out the reasonable and prudent alternatives that were suggested in the St. George Basin biological opinion to protect these two species of whales. Furthermore, he has offered no justification for his inaction. To this extent, his decision is arbitrary and amounts to a violation of section 7(a)(2).

Finally, I find that the Secretary has fully complied with his duties under the

Outer Continental Shelf Lands Act and that the plaintiffs have withdrawn all their claims under the Coastal Zone Management Act.

Since the Secretary has failed to comply with the National Environmental Protection Act and the Endangered Species Act, and because the potential harm to the plaintiffs and to the public interest outweighs any potential harm to the United States or to the intervenors, the execution of the leases will be enjoined until the Secretary complies. A final order and decree will be entered consistent with this opinion.